# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,

                Respondent,

      v.

YESHAK KOTOU BEDADA,

                Appellant.

DIVISION ONE

No. 79036-6-I

OPINION PUBLISHED IN PART

DWYER, J. — After a series of alleged incidents of domestic violence, Yeshak Bedada was charged with three counts of assault in the first degree and one count each of felony harassment, witness intimidation, and witness tampering. All of these charges were primarily supported by the testimony of Bedada's wife, Rahel Haile. At a jury trial, Bedada was acquitted of two counts of assault but convicted on all of the other charges. He now appeals, averring that, due to the trial court's decision to exclude evidence of his immigration status, he was prevented from cross-examining Haile and revealing a motive for her to fabricate her testimony. His contention that this ruling was erroneous has merit. Accordingly, we reverse the convictions and remand for further proceedings.

I

Yeshak Bedada and Rahel Haile immigrated to the United States from Ethiopia as a married couple. The couple had four daughters, K.Y., S.Y., Y.Y.,

and E.Y., all of whom were born in the United States. Eventually, Haile became a United States citizen while Bedada remained a noncitizen resident.

Over time, the couple's marriage deteriorated. Haile became suspicious that Bedada was having an affair, a suspicion Bedada later confirmed. Bedada also became a heavy drinker and would often accuse Haile of infidelity.

For years, Haile had sought a divorce, but Bedada refused and allegedly threatened to kill Haile if she proceeded. Haile testified that, on the night of December 26, 2016, she was roused from sleep by Bedada straddling her and demanding that she have sexual intercourse with him. Haile refused, prompting Bedada to state that he wanted to kill her and then strangling her to the point where she could not breathe.

K.Y. and S.Y. were awakened by the noises coming from their parents' bedroom and, upon entering the room, saw Bedada strangling Haile. K.Y. pushed Bedada off of Haile and both daughters then fled. Bedada followed his daughters into another room while continuing a tirade against Haile, who at this time believed that she would be dead before morning. Neither Haile nor her children telephoned the police, due to Bedada's threats that he would kill Haile, the children, and himself should anyone do so.

A similar incident was alleged to have occurred on the night of December 28, 2016.

In a third alleged incident on January 2, 2017, Bedada grabbed Haile, threw her onto the sofa, and began strangling her with both hands. Haile screamed for help from K.Y., who immediately intervened. Bedada first yelled at

K.Y. and then left the house. Again fearful for her life, Haile did not contact law enforcement.

However, K.Y. discussed these incidents with a school counselor, who contacted child protective services (CPS) to conduct an interview with K.Y. about Bedada's behavior. CPS alerted the police, who first contacted Haile and then arrested Bedada. Bedada told the police that he had never threatened or assaulted his wife. Based on the events described by Haile, Bedada was charged with three counts of assault in the second degree as well as felony harassment and witness intimidation.

Bedada later made a telephone call from jail to his friend "Jaffa," in which he urged Jaffa to involve elders of the church attended by his family in pressuring Haile to "drop the case." Following this, several of Bedada's friends who had no connection with the church, as well as one who did, visited Haile at her home and told her to make peace with Bedada and drop the charges. Based on this conduct, Bedada was also charged with witness tampering. All six offenses with which Bedada was charged were alleged to have been acts of domestic violence, to have occurred in the presence of children, and to have been part of an ongoing pattern of abuse.

Before trial, the State moved to exclude argument or testimony as to immigration consequences that Bedada might incur as the result of being convicted. Bedada's attorney objected, stating:

> Your honor, I am sure the court is aware that under evidence rule 611[(b)], I should be given very wide latitude to cross-examine witnesses—in terms of bias, prejudice or motive to fabricate.
> I believe that this is relevant information.

3

Usually in a criminal trial, I'm sure the court is aware the defense does not want the jury to know of the defendant's immigration status, but in this case where the complaining witness is a citizen, and a defendant is not, and the complaining witness knows that, the prosecutor—I should be allowed to make that argument—to bring that out to the jury and to bring that out that Ms. Haile is aware of this situation and—and make an argument based on that fact, that this could be a motive to fabricate under evidence rule 611[(b)].[1]

The court preliminarily granted the motion in limine to exclude reference to potential immigration consequences, but reserved a final ruling as to the cross-examination questions. It added:

I think it would be hugely prejudicial to the state, absent a— you know, clear relevance that it is more probative than prejudicial to have the jury hearing the case—within the back of their mind— not the question of is she lying because she wants to hurt him and get him away from her, but—but having in their mind, Oh, no, we— what we do here is going to result in him potentially being expelled from the country, which is not something that the jury should normally be considering in weighing what happened and how do I apply the law to that.

So the prejudicial effect is significant. If it has relevance, the court doesn't see it at this point, but I will allow there to be an opportunity to test that.

The next day, the court revisited the issue. Bedada's attorney stated that immigration status was, first, relevant to ensure the jury did not speculate as to either Bedada's or Haile's status. Bedada's attorney then engaged in the following colloquy with the court:

THE COURT: So connect the dots, Mr. Kolker. Why is her knowledge of his status a reason to fabricate?

MR. KOLKER: Because she knows that if he is convicted of this crime, he will be punished, he will be deported, and she will not

---

[1] In relevant part, ER 611(b) states:
Cross examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness. The court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination.

have to deal with him anymore. And he will not be able to fight for custody for her children; she will not have to spend money on an attorney. She has indicated that she has wanted a divorce for years and—

THE COURT: . . . So what is the qualitative difference here that he would be convicted and potentially punished and away from her on that basis versus deported?

MR. KOLKER: That is the basis for the argument, your honor, that she knows that. She knows that because she knows she is a citizen and he is not. And Mr. Bedada—this is a constitutional right that he has to confront witnesses and expose all bias, all motives to fabricate, all reasons why she may be motivated to not tell the truth in this situation. And I believe this is—this is more than just an evidentiary rule 611, this is a constitutional violation if he is not allowed to—if I am not allowed to cross-examine Ms. Haile on this issue.

Plus again I don't want the jury to speculate that Mr. Bedada is here illegally, charged with domestic violence, and if we don't clarify that, the jury—if I am not allowed to make that clear to the jury, they may speculate as to that.

How they got into the country is relevant. I assume that is going to come out on direct examination.

The court then asked the State as to whether it intended to inquire into Haile's citizenship or immigration status on direct examination. The prosecutor responded in the negative and reiterated the State's position that "there is not a relevant nexus here." Bedada's counsel then countered:

MR. KOLKER: Your honor, I would also point out that we intend to cross-examine the state's witnesses, and at least one of the state's witnesses has expressed that she has heard Ms. Haile say that—and the children will say—they want Mr. Bedada to go back to Ethiopia. That's what they want. That's why this is relevant. It is her motive, your honor.

THE COURT: All right, the court's view has not changed on this. It is a balancing question. It is a relevance question for the court.

I understand the argument that it is a constitutional infringement on the ability to confront one's accusers and so I am mindful of the argument.

The court's ruling at this point is that citizenship status, immigration status, potential immigration consequences of all kinds

5

relative to this proceeding are not relevant and may not be mentioned for any participant, not just for the defendant.

Later, while cross-examining Haile, Bedada elicited testimony that Haile wished for Bedada to return to Ethiopia, but did not probe the matter further. Bedada did not testify in his own defense.

The jury acquitted Bedada on the first two counts of assault in the second degree but convicted him on all of the remaining charges. The jury determined that the actions of which it convicted Bedada were crimes of domestic violence and occurred in the presence of children, but declined to find a pattern of abuse.

The court imposed an exceptional sentence of 68 months of confinement upon Bedada. He appeals.

II

A

The Sixth Amendment to the United States Constitution and article I, section 22 of Washington's constitution guarantee a defendant's rights to compulsory process and to confront the witnesses against him.[2] U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. However, these rights are not absolute and do not mandate the admission of irrelevant or otherwise inadmissible evidence. State v. Blair, 3 Wn. App. 2d 343, 349, 415 P.3d 1232 (2018). "The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." Taylor v. Illinois, 484 U.S. 400, 410, 108 S. Ct. 646, 98 L. Ed. 2d 798 (1988). Additionally,

---

[2] Courts and litigants often refer to these rights, collectively, as the "right to present a defense," although this phrase does not appear in our state or federal constitutions. See, e.g. State v. Arndt, 194 Wn.2d 784, 789, 453 P.3d 696 (2019).

courts may deny cross-examination if the evidence sought is vague, argumentative, or speculative. State v. Darden, 145 Wn.2d 612, 620-21, 41 P.3d 1189 (2002).

The proponent of the evidence bears the burden of establishing its relevance and materiality. State v. Pacheco, 107 Wn.2d 59, 67, 726 P.2d 981 (1986). Evidence is relevant if it tends to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. ER 401. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." ER 403. In balancing probative value against potential prejudicial effect, a court's considerations include

> "the importance of the fact of consequence for which the evidence is offered in the context of the litigation, the strength and length of the chain of inferences necessary to establish the fact of consequence, the availability of alternative means of proof, whether the fact of consequence for which the evidence is offered is being disputed, and, where appropriate, the potential effectiveness of a limiting instruction."

State v. Kendrick, 47 Wn. App. 620, 628, 736 P.2d 1079 (1987) (quoting MICHAEL H. GRAHAM, HANDBOOK OF FEDERAL EVIDENCE § 403.1, at 180-81 (2d ed. 1986)).

"In some instances regarding evidence of high probative value, 'it appears no state interest can be compelling enough to preclude its introduction consistent with the Sixth Amendment and Const. art. I, § 22.'" State v. Arndt, 194 Wn.2d 784, 812, 453 P.3d 696 (2019) (quoting State v. Hudlow, 99 Wn.2d 1, 16, 659 P.2d 514 (1983)).

7

In <u>State v. Clark</u>, 187 Wn.2d 641, 648-56, 389 P.3d 462 (2017), and again in <u>Arndt</u>, 194 Wn.2d at 797-98, our Supreme Court adhered to a two-step standard of review whereby a trial court's evidentiary rulings are reviewed for an abuse of discretion, while the question of whether such rulings violated a defendant's rights under the Sixth Amendment is reviewed de novo. We apply this method of analysis to the rulings at issue.

B

In Washington, evidence of immigration status may only be admitted when the proponent of the evidence follows the procedure set forth in ER 413(a). This rule, which came into effect September 1, 2018, provides:

> **(a) Criminal Cases; Evidence Generally Inadmissible.** In any criminal matter, evidence of a party's or a witness's immigration status shall not be admissible unless immigration status is an essential fact to prove an element of, or a defense to, the criminal offense with which the defendant is charged, or to show bias or prejudice of a witness pursuant to ER 607. The following procedure shall apply prior to any such proposed uses of immigration status evidence to show bias or prejudice of a witness:
> (1) A written pretrial motion shall be made that includes an offer of proof of the relevancy of the proposed evidence.
> (2) The written motion shall be accompanied by an affidavit or affidavits in which the offer of proof shall be stated.
> (3) If the court finds that the offer of proof is sufficient, the court shall order a hearing outside the presence of the jury.
> (4) The court may admit evidence of immigration status to show bias or prejudice if it finds the evidence is reliable and relevant, and that its probative value outweighs the prejudicial nature of evidence of immigration status.
> (5) Nothing in this section shall be construed to exclude evidence that would result in the violation of a defendant's constitutional rights.

ER 413(a).

Here, neither party disputes that ER 413 was in effect on September 4, 2018, the day on which Bedada's trial commenced, that Bedada did not comply with its requirements, or that the State did not call to the trial judge's attention any question of Bedada's failure to so comply. We are thus presented with an unusual situation due to the rule's effective date: Bedada's trial began with the hearing on the motions in limine on September 4. The State avers that "Bedada's effort to show that Haile lied because of his lack of citizenship falls squarely within the purview of [ER 413(a)]" and that "[e]vidence of Bedada's citizenship status was not admissible because he did not follow the procedure necessary for admitting it." There are, however, additional considerations that complicate the question of whether, or how, the new rule should be applied to Bedada's trial.

To admit evidence of immigration status, ER 413(a) requires that a written pretrial motion, including an offer of proof supported by affidavits, be filed with the trial court. ER 413(a)(1), (2). Our rules of criminal procedure incorporate CR 6 to dictate timing for filing of motions. CrR 8.1. CR 6(d) provides that written motions and supporting affidavits "shall be served not later than 5 days before the time specified for the hearing." CR 6(a) provides that "[w]hen the period of time prescribed or allowed is less than 7 days, intermediate Saturdays, Sundays and legal holidays shall be excluded in the computation." Here, the date of the proceeding at which the State moved to exclude evidence of Bedada's immigration status was September 4, 2018, a Tuesday. Excluding the preceding Saturday, Sunday, and Labor Day holiday, the five-day deadline for Bedada to

9

submit his motion to admit immigration status, with supporting affidavits, would have been August 27, 2018. Thus, to comply with the rule Bedada would have needed to prepare, and file, these documents with the court before the rule ever took effect. In other words, no rule required Bedada to file a motion (in anticipation of the State's motion) on August 27. By September 4, such a rule *was* effective. In short, Bedada's obligation to perform arose after the time for performance had expired. Our question is: how do we fairly deal with this?

Furthermore, although ER 413(a) was in effect at the time of the September 4 hearing, the record contains no mention of it—neither the State, nor defense counsel, nor the trial judge mention the rule. No one made any statement indicating an awareness of the new rule's existence or effectiveness, let alone its applicability to the proceeding. To be sure, the State did not raise noncompliance with the rule as a ground for excluding evidence of Bedada's immigration status. To the extent that, as the State now argues, Bedada's noncompliance with the rule's procedural requirements effected a waiver of his claim of error so, too, would the State's failure to call the trial court's attention to the rule effect a forfeiture of its objection on this ground. We cannot ignore the very real possibility that, had the State raised the issue, the uncertainty of the rule's applicability to defense counsel's obligations a week before the rule's effective date would have constituted good cause to have granted the defense a continuance in order to take the necessary steps to be in compliance.

Accordingly, a strict imposition of the rule's procedural requirements, when the rule was never invoked by either party and when strict compliance would

have necessitated action before the rule was in effect, would work a substantial injustice in this case. However, we confine this concern solely to the rule's procedural requirements. Our Supreme Court adopted this rule. Thus, the rule's substantive components reflect our Supreme Court's understanding of the state of the law on the date that the rule became effective. Hence, to further the "growth and development of the law of evidence to the end that the truth may be ascertained and proceedings justly determined," as ER 102 instructs us to do, we will employ ER 413(a)'s substantive components in determining whether the superior court abused its discretion by excluding Bedada's proffered evidence.

C

The substantive component of ER 413(a), again, is as follows:

> **(a) Criminal Cases; Evidence Generally Inadmissible.** In any criminal matter, evidence of a party's or a witness's immigration status shall not be admissible unless immigration status is an essential fact to prove an element of, or a defense to, the criminal offense with which the defendant is charged, or to show bias or prejudice of a witness pursuant to ER 607. The following procedure shall apply prior to any such proposed uses of immigration status evidence to show bias or prejudice of a witness:
> . . . .
> (4) The court may admit evidence of immigration status to show bias or prejudice if it finds that the evidence is reliable and relevant, and that its probative value outweighs the prejudicial nature of evidence of immigration status.
> (5) Nothing in this section shall be construed to exclude evidence that would result in the violation of a defendant's constitutional rights.

By its terms, ER 413(a) separates proffered evidence into three categories: (1) when immigration status is an essential element of, or a defense to, the criminal charge, (2) when immigration status is offered to show bias or prejudice of a witness, and (3) all other instances. In the first instance, the

11

evidence is admissible regardless of its potential for prejudice.  In the second instance, the evidence is admissible when its "probative value outweighs the prejudicial nature of evidence of immigration status."  ER 413(a)(4).  In the third instance, the evidence is presumptively inadmissible.[3]

Regarding the first instance, that evidence tending to prove an element of (or a defense to) a charge is deemed admissible is consistent with prior case law.  Our Supreme Court has recognized that, in these instances, the probative value of such evidence is of such significance that its admission is required, regardless of the prejudice that might otherwise result from its admission.  Arndt, 194 Wn.2d at 812; State v. Jones, 168 Wn.2d 713, 720, 230 P.3d 576 (2010).  But this has never meant that an unfair trial must result.  To the contrary, courts have long recognized that limiting instructions are a readily available means by which to mitigate whatever prejudice might otherwise result from the introduction of evidence that is admissible for one purpose but not for others.  Indeed, ER 105[4] exists for this very reason, as does pattern jury instruction WPIC 5.30.[5]  Thus, the calculation is clear: some evidence is so important that it must be admitted and

---

[3] Presumably, this presumption would be overcome when exclusion of the proffered evidence "would result in the violation of a defendant's constitutional rights."  ER 413(a)(5).

[4] ER 105 provides:

> When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly.

[5] WPIC 5.30 provides:

> Certain evidence has been admitted in this case for only a limited purpose.  This evidence [consists of _____ and] may be considered by you only for the purpose of _____.  You may not consider it for any other purpose.  Any discussion of the evidence during your deliberations must be consistent with this limitation.

11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 5.30 (4th ed. 2016) (WPIC).

limiting instructions are the mechanism by which unfair trials are avoided and prejudice minimized.

The second instance is treated differently. Evidence of immigration status is not automatically admissible when it is proffered to demonstrate the bias or prejudice of a witness. Instead, the rule provides that

> [t]he court may admit evidence of immigration status to show bias or prejudice if it finds that the evidence is reliable and relevant, and that its probative value outweighs the prejudicial nature of evidence of immigration status.

ER 413(a)(4).[6]

This is the applicable standard for determining whether evidence of Bedada's immigration status should have been admitted to demonstrate bias or prejudice on the part of the prosecution's key witness, Rahel Haile. Moreover, in analyzing the ruling, we must pay heed to the entirety of the rule, including the calculation that—given the usefulness of limiting instructions—the introduction of evidence of immigration status does not result in an unfair trial when the evidence is presented for sufficiently weighty reasons.

Bedada's offer of proof was made after the State moved to exclude evidence of any party's or witness's immigration status. His attorney stated:

> [Haile] knows that if he is convicted of this crime, he will be punished, he will be deported, and she will not have to deal with him anymore. And he will not be able to fight for custody for her children; she will not have to spend money on an attorney. She has indicated that she has wanted a divorce for years and—
>     THE COURT: . . . So what is the qualitative difference here that he would be convicted and potentially punished and away from her on that basis versus deported?

---

[6] This balancing test is substantially similar to that of ER 403.

MR. KOLKER: That is the basis for the argument, your honor, that she knows that. She knows that because she is a citizen and he is not. . . .

At least one of the state's witnesses has expressed that she has heard Ms. Haile say that—and the children will say—they want Mr. Bedada to go back to Ethiopia. That's what they want. That's why this is relevant. It is her motive, your honor.

The court's reasoning in excluding this evidence was that

[i]t is a balancing question. It is a relevance question for the court. . . .The court's ruling at this point is that citizenship status, immigration status, potential immigration consequences of all kinds relative to this proceeding are not relevant and may not be mentioned for any participant, not just for the defendant.

The court did not provide reasons, either during this hearing or in its written order on the parties' motions in limine, as to why the evidence was not relevant. The court's written order stated only that

[d]efense asked to be able to go into potential immigration consequences, stating they believed it presented a motive for fabrication by the victim. The Court finds that immigration status, citizenship status, and immigration consequences are not relevant and shall not be mentioned by any witness, party or attorney.

Plainly, evidence of a motive to fabricate on the part of Haile—whose testimony was the principal evidence supporting every charge against Bedada—could affect a fact finder's analysis as to whether the facts alleged by Haile were true. No party disputed the reliability of evidence of Bedada's noncitizenship. To the extent that the trial court engaged in a balancing of the probative value and prejudicial effect of the proffered evidence, it unfortunately omitted or misapplied several critical factors necessary to a proper analysis.

14

D

First, in granting the State's motion to exclude, the court appears to have accepted the State's claim that such evidence would be unduly prejudicial due to the evidence's potential to "inflame the passions or prejudice of the jury as to Mr. Bedada's immigration status and any potential consequences that he may face." However, if evidence is "'relevant, the burden is on the State to show that the evidence is so prejudicial as to disrupt the fairness of the fact-finding process at trial.'" Jones, 168 Wn.2d at 720 (quoting Darden, 145 Wn.2d at 622). The State's assertion did not identify, with any particularity, the prejudice that the State would encounter beyond a generalized concern of immigration as a sensitive political issue. The lack of a specific, as opposed to merely a general, prejudicial effect is significant.

During this trial, even in the absence of evidence of Bedada's noncitizen status, the jury was allowed to hear testimony indicating that Bedada and Haile were Ethiopian immigrants, and, further, that Haile wanted Bedada to return to Ethiopia. Immigration was not a matter so inherently sensitive as to compel exclusion of this evidence, and the trial court indicated that questioning of the jury pool in voir dire could root out any biases relating to immigrants.

At the end of the case, the jury was given the following instruction:

> As jurors, you are officers of this court. You must not let your emotions overcome your rational thought process. You must reach your decision based on the facts proved to you and on the law given to you, and not be influenced by any personal likes or dislikes, sympathy, prejudice, or biases, including unconscious biases. Unconscious biases are stereotypes, attitudes, or preferences that people may consciously reject but may be expressed without conscious awareness, control or intention. To

15

> assure that all parties receive a fair trial, you must act impartially
> with an earnest desire to reach a proper verdict.

Jury Instruction 1.

Neither the State nor the court identified any prejudicial effect—specific to this case—that might result from the introduction of evidence of Bedada's immigration status. It is so that a generalized prejudice may be present in every case in which evidence of immigration status is admitted. But, by itself, such generalized prejudice does not necessarily result in an unfair trial. Were it otherwise, a trial in which the prosecution introduced evidence of immigration status to prove an element of a crime would necessarily be an unfair trial. And we know that our Supreme Court, the authors of ER 413(a), are not of this view.

Moreover, the trial court considered the proffered evidence's potential prejudice only as it would exist in the absence of an appropriate limiting instruction. Indeed, the trial court did not address the availability, desirability, or effectiveness of a limiting instruction at all. But appropriate limiting instructions could have informed the jury that it was to consider Bedada's noncitizen status only insofar as it may have affected Haile's decision to testify as she did. Because the jury would have received any limiting instruction prior to commencing its deliberations, the prejudicial effect of generalized concerns regarding immigration status could have been ameliorated. By not considering this, the trial court over emphasized the possible prejudice of this proffered evidence in its balancing analysis. Indeed, under ER 403, the effectiveness of limiting instructions has long been a mandatory component of that rule's

16

balancing analysis.  Kendrick, 47 Wn. App. at 628.  So, too, should it be a component of ER 413(a) balancing.

It is also significant that Bedada, as the only noncitizen party or witness in the case, was the only person who faced any risk from a perceived jury bias against immigrants.  In its briefing, the State identifies potential jury bias against immigrants as a rationale for excluding the evidence—essentially arguing that Bedada could not introduce the evidence because it would have been prejudicial to *him*.  To the extent that the trial court accepted this argument in its balancing analysis, it erred.  "Implicit in the Sixth Amendment is a criminal defendant's right to control his defense."  State v. Wiebe, 195 Wn. App. 252, 259, 377 P.3d 290 (2016) (citing State v. Jones, 99 Wn.2d 735, 740, 664 P.2d 1216 (1983)).  If the introduction of evidence of Bedada's immigration status raised a possibility of bias against him, Bedada was entitled to shoulder that burden in order to effectively confront his primary accuser.

The trial court also erred by accepting the State's contention that evidence of potential consequences that flow from a defendant's conviction can *never* be presented to a jury.[7]  This is not so.  To the contrary, a witness's subjective belief that a defendant might face a specific consequence if the witness complains to the police or testifies at trial is often a subject raised at trial.  For example, in cases involving sex crimes in which victims or witnesses either delayed reporting

---

[7] This argument appears to stem from the standard jury instruction reading:
    You have nothing whatever to do with any punishment that may be imposed in case of a violation of the law.  You may not consider the fact that punishment may follow conviction except insofar as it may tend to make you careful.
WPIC 1.02.  That instruction was given here.

the crimes or made prior statements inconsistent with their testimony, courts have regularly allowed prosecutors to elicit testimony as to what consequences the witnesses believed might follow arrest or conviction and, in so doing, explain to juries why the witnesses either delayed reporting or made subsequent inconsistent statements.  See, e.g., State v. Petrich, 101 Wn.2d 566, 568, 683 P.2d 173 (1984), abrogated on other grounds by, State v. Kitchen, 110 Wn.2d 403, 756 P.2d 105 (1988) (victim who delayed reporting "explained that [accused] had told her not to tell, that she feared she would not be believed or loved if she told, and that her grandfather would go to jail"); State v. Baker, 162 Wn. App. 468, 470-71, 259 P.3d 270 (2011) (victim testified to not calling police after domestic violence incident "because she loved [defendant] and did not want to get him in trouble"); State v. Nieto, 119 Wn. App. 157, 160, 79 P.3d 473 (2003) (witness "said she lied in her statement . . . because [police] led her to believe [defendant] would be sentenced to a longer jail term if she did not write a statement").  Thus, the probative value of the proffered testimony was greater than that assigned by the trial court.

The fact that it was the defendant, and not the prosecution, who desired to admit evidence that punishment might follow conviction is not a legitimate distinction.  Here, Bedada contended that his wife wanted a divorce and that she wanted him out of their children's lives.  This desire is arguably related to a motive for her to fabricate.  The trial court erred by discounting this possibility.

This error was compounded by extending the ruling to deportation consequences.  Bedada's belief that the primary witness against him desired his

deportation was well-founded.[8]  And deportation is not the same as imprisonment.  Bedada was entitled to argue that his deportation would have been even more effective than his imprisonment in bringing about his accuser's goals of divorcing him and removing him from their children's lives forever.  The trial court erred by discounting this in its balancing.

Finally, Haile was the primary witness against Bedada in every charge against him.  She was the State's most important witness.  Demonstrating bias on the part of the key witness has long been deemed an important element of a defendant's right to present a defense.  State v. Fisher, 165 Wn.2d 727, 752, 202 P.3d 937 (2009).  "A defendant enjoys more latitude to expose the bias of a key witness."  Fisher, 165 Wn.2d at 752 (citing Darden, 145 Wn.2d at 619).

For all of these reasons, the trial court's decision to exclude evidence of Bedada's immigration status constituted an abuse of discretion.  The convictions must be reversed and the case remanded for a new trial.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

---

[8] At Bedada's sentencing, Haile requested that the trial court "not allow [Bedada] to stay here in this country.  He needs to go back to Ethiopia and get help."  While this statement was not in the record at the time the trial court conducted its balancing test, Haile's request certainly does not undercut Bedada's theory of the case.

III

Bedada next asserts that his conviction for witness tampering was not supported by sufficient evidence.[9] This is so, he asserts, because the facts as proved showed Bedada only asked his friend to tell Haile to "drop the case," and Haile testified that she was not threatened by any of Bedada's friends who appeared at her house to instruct her to this effect. Because the evidence, viewed in the light most favorable to the State, shows a concerted effort by Bedada to tamper with Haile in her role as a witness, his claim fails.

The due process clauses of the federal and state constitutions require that the State prove every element of a crime beyond a reasonable doubt. Apprendi v. New Jersey, 530 U.S. 466, 476-77, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2006); U.S. CONST. amend. XIV; WASH. CONST. art. 1, § 3. "[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be . . . to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 318, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319.

"A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." State v. Salinas, 119

---

[9] We address this claim of error because, if it is meritorious, retrial is barred. State v. Ervin, 158 Wn.2d 746, 757-58, 147 P.3d 567 (2006). Other claims of error raised by Bedada's attorney need not be addressed, given our holding on the first issue presented.

Wn.2d 192, 201, 829 P.2d 1068 (1992). In determining the sufficiency of the evidence, circumstantial evidence is not to be considered any less reliable than direct evidence. State v. Johnson, 188 Wn.2d 742, 763, 399 P.3d 507 (2017).

The elements of witness tampering are set out in RCW 9A.72.120.

> (1) A person is guilty of tampering with a witness if he or she attempts to induce a witness or person he or she has reason to believe is about to be called as a witness in any official proceeding or a person whom he or she has reason to believe may have information relevant to a criminal investigation or the abuse or neglect of a minor child to:
> (a) Testify falsely or, without right or privilege to do so, to withhold any testimony; or
> (b) Absent himself or herself from such proceedings; or
> (c) Withhold from a law enforcement agency information which he or she has relevant to a criminal investigation or the abuse or neglect of a minor child to the agency.

"Testimony" is defined as "oral or written statements, documents, or any other material that may be offered by a witness in an official proceeding." RCW 9A.72.010(6). "Official proceeding," meanwhile, is defined as "a proceeding heard before any legislative, judicial, administrative, or other government agency or official authorized to hear evidence under oath." RCW 9A.72.010(4).

Here, Haile identified Bedada's voice in a telephone call made from a jail telephone while Bedada was in jail, awaiting trial. In that call, Bedada told his friend, who Haile identified as "Jaffa," that Haile "need[ed] to be encouraged by the church to drop the case. If the case won't drop, it is not good for me." He went on to tell Jaffa that he knew Haile would be at church the next day, and that Jaffa should "gather church elders to talk to her and tell her that I am sick." Haile testified that several of Bedada's friends—one of whom purported to be a member of the same church—came to her home to tell her to "drop the case."

21

In attacking the sufficiency of the evidence, Bedada relies on State v. Rempel, 114 Wn.2d 77, 785 P.2d 1134 (1990). Therein, after the defendant was jailed on a charge of attempted rape, he made several telephone calls to the victim, with whom he had a casual acquaintance. Rempel, 114 Wn.2d at 80-81. In these calls, Rempel asked the victim to "drop the charges" and stated that she would "ruin his life," but the victim explained to him that she did not have control over prosecution of the matter and eventually stopped answering his calls. Rempel, 114 Wn.2d at 81. The Supreme Court overturned Rempel's conviction for witness tampering, stating:

> The entire context negates any inference that the request to "drop the charge" was in fact an inducement to withhold testimony from a later trial. [Witness] testified that the calls did not concern her, that she did not worry about them "other than the fact that he was a real nuisance.". . .
> . . . [T]he witness' reaction here is relevant because it tends to disprove the State's claim that the context of the words spoken shows an attempt to induce [witness] to withhold testimony.
> We do not hold that the words "drop the charges" cannot sustain a conviction if uttered in a factual context which would lead to a reasonable inference that the speaker actually attempted to induce a witness to withhold testimony. Given the context here, however, we conclude that no such inference can be drawn.

Rempel, 114 Wn.2d at 84.

Thus, in Rempel, the Supreme Court viewed the evidence as insufficient because the defendant and victim had no particularly close relationship and the telephone calls were more of an annoyance to the victim than anything else. 114 Wn.2d at 84. Here, however, the telephone entreaties were made not to the alleged victim but, rather, to others in the community, and outlined a plan to employ the social authority of respected members of the church community of

22

which Haile, Bedada, and their children were a part.  The telephone transcripts show that Bedada directed Jaffa to enlist church elders in confronting Haile when she appeared at church that Sunday.  In addition, Bedada's friends, including one member of the church (but also several others), appeared at Haile's home bearing the same message that Bedada sought to convey.  This plainly supports the existence of a more thorough effort to tamper with a witness than that which took place in Rempel.  A reasonable jury could conclude from all of this evidence that Bedada attempted to induce Haile to absent herself from the proceeding, withhold testimony, or testify falsely.  Thus, sufficient evidence supports this conviction.

IV

The convictions are reversed.  The cause is remanded to the superior court.

Dwyer, J.

WE CONCUR:

Mann, C.J.