IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 81106-1-I |
| Respondent, | DIVISION ONE |
| v. | |
| TAMEE MARIE PURDY, | UNPUBLISHED OPINION |
| Appellant. | |

CHUN, J. — A jury found Tamee Marie Purdy guilty of assault in the third degree. Purdy appeals, contending the trial court erred by (1) admitting certain pre- and post-arrest evidence, (2) excluding certain post-arrest video evidence, and (3) inadvertently imposing discretionary legal financial obligations (LFOs). For the reasons discussed below, we remand for the trial court to strike the supervision fees and affirm in all other respects.

## I. BACKGROUND

### A. Facts

On New Year's Eve 2017, at the Madison Street Pub (Pub) in Everett, bouncer Tony Stiffarm confronted a female patron who bartenders refused to serve. Law enforcement later purported to identify the patron as Purdy. According to Stiffarm, he told the patron that "she cannot yell at my customers. You will not be served. You can stay and watch karaoke if you want, but you cannot have a drink." The patron became "irate" and uncooperative, but eventually left. "Then shortly later, she came back." Stiffarm testified, "I had to

Citations and pin cites are based on the Westlaw online version of the cited material.

confront her with my hands in my pockets, excuse me, Ma'am, you're not welcome here again. I need you to leave my building." She eventually left.

Meanwhile, someone called 911 to report a disturbance at the Pub. "[A] little bit before midnight," Everett Police Officers Ryan Greely and Stephen Klocker responded. According to Greely, Stiffarm said that the patron who caused the disturbance was a "[s]lender female, [with] long hair, [a] white jacket, [and] brown boots."[1] Stiffarm described what happened and said the patron had left. He said he saw her go north on Fleming Street. The officers ceased investigating and left the Pub.

"Three to four minutes" after Officer Klocker left the Pub, he drove on "the 6700 block of Fleming" Street and observed Purdy "[s]taggering out in the middle of the street." Klocker testified that Purdy "matched the description of the party who -- we received at the pub." Although at trial, he could not recall what that description was. Klocker testified that as he drove by, "she saw me, she got rather animated and started flipping me off and cursing at me." But he "ignored her and continued driving."

Dawn Lashbrook was walking home from a neighbor's party on a residential portion of Fleming Street that did not have sidewalks. Lashbrook testified to the following: Purdy "was really loud walking on Fleming." She said,

> [L]iving on Fleming is very interesting anyway, because you get a lot of interesting characters. So usually people just mind their own business. And you're used to that when you live there. But she was like overly -- and it made me, you know, kind of nervous. And I think

---

[1] At trial, Stiffarm testified only that the patron was "a taller, white female."

that's why I called the police just because I was nervous.  I live alone so . . .

"[W]e were yelling back and forth just because I was wanting her to just move along, and she wasn't going down the street."

Officer Greely learned about Lashbrook's call about "nine minutes after midnight" and responded to it.  He testified to the following: He went to the 6400 block of Fleming Street, which was "a couple of blocks north of the" Pub.  He found Purdy "walking in the middle" of the street and she was yelling at "neighbors out on their [respective] porch[es]."  Purdy and the neighbors threatened "to beat each other's asses."  Greely got out of his patrol vehicle, walked toward Purdy, identified himself, and asked Purdy to stop.  Purdy responded, "[G]et the fuck away."  She kept walking and yelling at the neighbors.  Greely was concerned there would be a fight and felt "[t]here really wasn't a chance" to deescalate the situation with further verbal commands.  To prevent a fight, Greely grabbed Purdy's arm.  Purdy responded by punching Greely's shoulder and causing him "temporary pain, soreness."  Greely then "took her down to the ground" and handcuffed her.  While on the ground, Purdy called Greely "a bitch."  Greely then called other officers and a supervisor for help.

Lashbrook testified that Purdy was not cooperating with the officers.  She remembered Purdy "pushing him or something."

Lashbrook's neighbor Steve Danielson testified to the following: He was celebrating New Year's Eve at his neighbor's house.  "[A]t midnight or shortly after," he saw a law enforcement vehicle's flashing lights, and went outside to "see what was going on."  From across Fleming Street, he saw Purdy on the

3

ground. When an officer tried to get her off the ground, "she wasn't too cooperative." Purdy "was pretty belligerent" and "acting pretty out of control." Once she was standing, she "[g]rabbed him, was throwing punches, [and] cussing" at the officer. Then, the officer "took her to the ground."

Purdy's friend Jason Heil testified to the following: He had been at the Pub with Purdy earlier that evening. The Pub was "extremely rowdy" so he left for another bar nearby and Purdy stayed. Heil did not see Purdy interact with Stiffarm. Just after midnight, Heil left the other bar and was on Fleming Street in a taxi when he recognized Purdy because she was wearing the same white jacket that she had been wearing at the Pub. He saw Purdy and an officer yelling at each other and, within a "split second," the officer "got her with the arm, and then he tucked her in, and she went down." Heil did not see Purdy "hit the officer." Next, he saw the officer get Purdy up, and "put the handcuffs on." He said the officer "was celebrating" and his face expressed "joy, like I just got -- got her."

Officer Klocker testified that he responded to Greely's call "just a few minutes" after he saw Purdy in the street. He also testified that Greely and Purdy were in the "6400 block, which would be about two or three blocks north of where I'd initially seen her." Officer Nathan Wallace also responded to Greely's call. Wallace and Klocker testified that, when they arrived, Purdy was "[d]runk, belligerent, obnoxious," "threatening," and "yelling" at Greely. Purdy told Klocker that Greely was "a pussy and . . . needed to grow a dick."

4

Klocker then took photographs of Purdy's injuries—abrasions on her chin and hand—and of Greely. Each time Klocker took a photograph, he inadvertently took a short video. In the video, an officer says, "You should've just let those people beat her ass," and another officer responds by chuckling. Klocker then placed Purdy in the back of his patrol vehicle. Klocker testified that while in the patrol vehicle, Purdy "continu[ed] to berate, insult, and threaten us." According to Klocker, Purdy said "she could rip our throats out."

B. Procedural History

The State charged Purdy with third degree assault of Greely.

Before trial, the court considered the parties' motions in limine. The State moved to admit Stiffarm's testimony that the female patron was intoxicated, he asked her to leave the Pub, and "she immediately became combative, slapping, kicking, and spitting on him." The State asserted that Stiffarm's testimony was res gestae and probative evidence to rebut Purdy's defense that Greely assaulted her because it showed that "Purdy is assaultive moments before, the same night with another authority figure, a bouncer at a pub." Purdy did not dispute being at the Pub. She argued that Stiffarm's testimony would be more prejudicial than probative and the jury could mistake it as propensity evidence— "that because she assaulted the bouncer, she must have assaulted the police officer later that evening." The trial court determined Stiffarm's testimony concerned "what was going on with her shortly before this offense" and "the State's recitation of what they believe Mr. Stiffarm will testify to is that she also was combative and refused to follow his direction when given, which I think are --

5

are different in that I'm not sure that is 404(b), I mean, that is not an uncharged crime." The trial court said, "I do not see the prejudicial nature of any testimony as to what Ms. Purdy's demeanor was."

Purdy also objected, "[I]t's not clear to me that [Stiffarm] identifies Ms. Purdy at all during the evening." The trial court stated, "It seems like there's a question right now as to whether or not Mr. Stiffarm will identify Ms. Purdy or has identified Ms. Purdy as the person that was in the Madison Pub. Assuming that he can, we will hear his testimony as to what occurred."

The State asked the trial court to admit Purdy's post-arrest statements to the officers. The State at first argued the statements were admissible under ER 404(b). The State then changed course and asked the trial court to admit the evidence as relevant to Purdy's state of mind under ER 401 and 403. Purdy responded that the statements were inadmissible as more prejudicial than probative under ER 403. The court admitted the statements as "relevant as to her state of mind."

Before opening statements, the defense advanced the theory that Greely tackled Purdy "because she flipped him off and swore at him, and then [he] made up a false story that [she] assaulted him to justify his excessive use of force after he saw she was injured." To support this theory, Purdy moved to admit the video taken by Klocker. After watching the video, the trial court denied Purdy's request, explaining that it was unclear who was speaking in the video, but recognizing that "[i]t may be that based on testimony that comes out, this

becomes relevant." The trial court also stated, "I'm really struggling to see how – how the video is relevant."

During trial, Purdy again moved for the trial court to exclude testimony of her post-arrest statements to the officers arguing it was more prejudicial than probative. The trial court stated

> I think that her statements beyond simply flipping [the officers] off and saying, Fuck you and then being tackled, the statements that she could rip out their throats and that the assaulting officer was a pussy and needed to grow a dick go directly towards her frame of mind in terms of her interactions with the officer. So, again, without something new or more, I don't have any information that would cause the Court to reconsider its earlier decision to admit the statements that were admitted at the 3.5 hearing.

During Klocker's cross-examination, Purdy also again asked the court to admit the video. Klocker testified that Wallace said to Greely, "You should've just let those people beat her ass," and Greely responded by chuckling. Purdy argued the video was admissible as evidence of Greely's state of mind and bias toward her, and admissible to impeach Greely's testimony that she was belligerent. The State argued that because Purdy's, rather than Greely's, state of mind was at issue, the video was irrelevant. The trial court disagreed "that Officer Greely's state of mind is not at issue given [Purdy's] theory is that he lied in order to avoid making a use of force report after observing Ms. Purdy's injuries. However, I now can find no tangible connection between Sergeant Wallace's statement after the fact." The trial court determined,

> Whether or not he thought someone else's statement later was funny I think has limited value as to what he was thinking at the time that he had an altercation with Ms. Purdy, because this all happens after the fact.
>
> . . . .

7

So I don't see how his chuckling at a comment after the fact can at all be interpreted to determine what he -- whether or not he tackled Ms. Purdy and then lied about it.

The trial court excluded the video.

Before Stiffarm testified, Purdy again asked the trial court to exclude his testimony: "My issue [is] with Mr. Stiffarm testifying about the fact that he encountered a female . . . [and] he doesn't recall what this woman looks like.  He didn't go and do any sort of like identification process to identify that it was Ms. Purdy."  She also asserted, "My concern is that he can't identify who this is and so that would be not relevant.  It would be prejudicial if it were let in.  I just -- I just don't see that the State can show by a preponderance that it's -- that it's Ms. Purdy at all."  The State argued that while there was "no direct identification[,] . . . there is sufficient circumstantial evidence to establish identification by a preponderance of the evidence."

The trial court allowed Stiffarm to testify to a certain extent.  It reasoned that

> the information that the police responded to the Madison Pub and the information they received was partly to identify the same description of the person and partly to explain what Officer Greely knew and understood the situation to be when -- when he came upon her.
>
> Also, I'll allow Mr. Stiffarm's testimony that is consistent with that. I would agree that other statements, given the -- I think this establishes the identity of Ms. Purdy by a preponderance of the evidence given what Officer Greely reported.  However, I would agree that the exact statements as to cuss words that she used, that she hit, kicked or was physical with him would be unduly prejudicial given his inability to identify Ms. Purdy today as that person and that he was simply -- related on the night of the general description of a female and what she was wearing.

8

Stiffarm testified that the irate patron was a tall, white female. He said the patron

was uncooperative. He said, "[S]he was not cooperative one bit . . . . [W]hen she

came back the second time and I asked her to leave, she started being physical."

Purdy objected and the trial court sustained the objection, stating, "The jury's

instructed to disregard the last statement."

The jury convicted Purdy as charged. The trial court granted Purdy a first

time offender waiver" and sentenced her to 240 hours of community restitution

and 12 months of community custody under the supervision of the Department of

Corrections (DOC). During the sentencing hearing, the trial court said, "I will find

that Ms. Purdy is indigent for the purposes of legal financial obligations, impose

only the $500 victim penalty assessment and the $100 DNA fee."

Purdy appeals.

## II. ANALYSIS

### A. Evidence of Purdy's Acts

Purdy says the trial court violated ER 404(b) by admitting Stiffarm's

testimony. She also says the trial court erred by admitting her post-arrest

statements to the officers. The State responds that the evidence was admissible

as res gestae and relevant under ER 402.

We review a trial court's evidentiary rulings for abuse of discretion. State

v. Dillon, 12 Wn. App. 2d 133, 146, 456 P.3d 1199, review denied, 195 Wn.2d

1022, 464 P.3d 198 (2020). "A trial court abuses its discretion if its decision is

based on untenable grounds, an erroneous view of the law, or is manifestly

9

unreasonable. If evidence was improperly admitted, the court analyzes whether the improper admission was harmless." Id. (citations omitted).

Generally, all relevant evidence is admissible. ER 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. The trial court may exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice." ER 403.

Under ER 404(b):

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

But "ER 404(b) does not restrict evidence of acts that are closely associated with the crime charged." State v. Sullivan, 18 Wn. App. 225, 235, 491 P.3d 176 (2021). Res gestae or same-transaction evidence is "'admissible to complete the story of a crime or to provide the immediate context for events close in both time and place to the charged crime.'" Dillon, 12 Wn. App. 2d at 148 (quoting State v. Lillard, 122 Wn. App. 422, 432, 93 P.3d 969 (2004)). "[R]es gestae evidence 'more appropriately falls within ER 401's definition of 'relevant' evidence, which is generally admissible under ER 402' rather than an exception to propensity evidence under ER 404(b)." Id. (quoting State v. Grier, 168 Wn. App. 635, 646–47, 278 P.3d 225 (2012)).

The trial court instructed the jury that an element of assault "is an intentional touching or striking of another person that is harmful or offensive regardless of whether any physical injury is done to the person." To prove Purdy assaulted Greely, the State had to prove she intentionally hit or punched Greely.

1. Stiffarm's Testimony

Purdy contends the trial court abused its discretion in admitting Stiffarm's testimony about the female patron who was belligerent, uncooperative, and physical[2] and not conducting an ER 404(b) analysis. She says ER 404(b) bars Stiffarm's testimony because the jury could view it "as showing her propensity to be assaultive and uncooperative and therefore she was the type of person who would assault a police officer." The State responds that Stiffarm's testimony was admissible as res gestae.[3] We agree with the State.

In Sullivan, the State charged the defendant with robbery in the first degree with a deadly weapon and unlawful possession of a firearm. 18 Wn. App at 232. To prove a material element of the crimes, the trial court admitted evidence that the defendant had been involved in a shooting 25 minutes before the robbery. Id. at 237. The trial court also admitted the evidence as res gestae because the events occurred close in time. Id. On appeal, we determined the

---

[2] Purdy contends that although the trial court sustained her objection to Stiffarm's testimony that she was "physical" with him, and despite the court's instruction, "jurors would be unlikely to erase this information from their minds given the tenor of the testimony and the prosecution's reliance on it in closing argument." Without evidence otherwise, we presume juries follow instructions. State v. Dye, 178 Wn.2d 541, 556, 309 P.3d 1192 (2013). We thus do not address the stricken testimony.

[3] The State also contends Stiffarm's testimony is relevant to show what Greely knew when he responded to Lashbrook's call and to rebut Purdy's defense that Greely assaulted her. Because the evidence was admissible as res gestae and as relevant evidence of Purdy's state of mind before the assault, we do not reach this contention.

trial court acted within its discretion. Id. at 239. The evidence from the shooting was material to elements of both robbery in the first degree with a deadly weapon and unlawful possession of a firearm and necessary to provide context for the robbery. Id. We determined that the evidence was not evidence of other misconduct requiring the application of ER 404(b). Id. at 240.

While the trial court here did not use the term "res gestae" or "same transaction," in response to the State's res gestae argument, it essentially conducted a res gestae analysis. The trial court found Stiffarm's testimony relevant to "what was going on with her shortly before this offense," including her state of mind and demeanor. The trial court determined that Purdy's assault of Greely occurred shortly after and in the same area as her interaction with Stiffarm at the Pub. During trial, the court also viewed Stiffarm's testimony as relevant "to explain what Officer Greely knew and understood the situation to be when -- when he came upon her."

The trial court did not abuse its discretion[4] because Stiffarm and Purdy's interaction occurred a few minutes before and a few blocks away from the assault on Officer Greely, and was relevant to show her state of mind just before the assault and therefore to show the intent element of the crime. As in Sullivan,

---

[4] Even if the trial court erred in admitting Stiffarm's testimony about Purdy's conduct, the error would have been harmless because of the extensive other evidence that Purdy engaged in similar behavior that evening. See State v. Ashley, 186 Wn.2d 32, 47, 375 P.3d 673 (2016) ("Erroneous admission of evidence in violation of ER 404(b) is harmless unless there is a reasonable probability that the verdict would have been materially different but for the error.").

Stiffarm's testimony was part of the immediate context of the assault, so it was admissible as res gestae and ER 404(b) did not apply.[5]

2. Purdy's Post-Arrest Statements to the Officers

Purdy contends the trial court erred by admitting evidence of her post-arrest statements to the officers. The State contends the evidence was admissible as res gestae and as evidence of Purdy's state of mind. We conclude that Purdy's post-arrest statements were relevant to her state of mind.

The trial court admitted the testimony because it found "the statements that she could rip out their throats and that the assaulting officer was a pussy and needed to grow a dick go directly towards her frame of mind in terms of her interactions with the officer." In Dillon, we determined a defendant's post-arrest threats to the arresting officer were admissible to show the defendant's state of mind and hostility toward the officer at the time of the crimes and was not subject to ER 404(b). 12 Wn. App. 2d at 150. Likewise, here, Purdy's statements were relevant to show Purdy's intent and were not subject to ER 404(b). The trial court did not abuse its discretion in admitting this evidence.[6]

---

[5] Purdy contends the trial court "deemed ER 404(b) inapplicable and admitted the evidence without limitation." The State responds that because Purdy did not request a limiting instruction, the court did not have to give one about her pre- and post-arrest behavior. We agree with the State. See State v. Russell, 171 Wn.2d 118, 123, 249 P.3d 604 (2011) ("[A]bsent a request for a limiting instruction, the trial court is not required to give one sua sponte."); State v. Gresham, 173 Wn.2d 405, 424, 269 P.3d 207 (2012) ("[I]n the context of ER 404(b) limiting instructions, once a criminal defendant requests a limiting instruction, the trial court has a duty to correctly instruct the jury, notwithstanding defense counsel's failure to propose a correct instruction."). In any event, because we conclude that Stiffarm's evidence was res gestae, a limiting instruction about Purdy's behavior was unnecessary.

[6] Given this conclusion, we do not reach the res gestae issue about the post-arrest statements.

13

B. Post-Arrest Video

Purdy says the trial court violated her Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution right to present a defense by excluding the post-arrest video. She contends the video was admissible to undercut the State's claim that she was irate and hostile and to impeach Greely's testimony that she injured him, causing "temporary pain [and] soreness." (Alteration in original.) The State counters that the video tracks its claim that Purdy was belligerent and was irrelevant because Greely's chuckle was not probative of his state of mind or injury. The State also says, if the video has any probative value, its potential for prejudice outweighed that value. We conclude the trial court did not deprive Purdy of her right to present a defense.

The state and federal constitutions guarantee a defendant the right to present a defense. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22; State v. Hudlow, 99 Wn.2d 1, 14–15, 659 P.2d 514 (1983). But that right is not absolute. State v. Bedada, 13 Wn. App. 2d 185, 193, 463 P.3d 125 (2020). For example, a defendant has "no constitutional right to present irrelevant evidence." State v. Jones, 168 Wn.2d 713, 720, 230 P.3d 576 (2010) (emphasis omitted).

For claims of a violation of the right to present a defense, we apply a two-step process: (1) we "review the trial court's individual evidentiary rulings for an abuse of discretion," and (2) we "consider de novo the constitutional question of whether these rulings deprived [Purdy] of her Sixth Amendment right to present a defense." State v. Arndt, 194 Wn.2d 784, 797–98, 453 P.3d 696 (2019).

14

First, we consider whether the trial court abused its discretion in excluding the video. As discussed above, only relevant evidence is admissible. ER 402. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." ER 401. "The proponent of the evidence bears the burden of establishing its relevance and materiality." Bedada, 13 Wn. App. 2d at 193.

Purdy says the video shows her calm demeanor, which contradicts the State's contention that she was irate and hostile after her arrest. She contends the video was thus relevant to whether she intentionally assaulted and injured Greely. The State responds that "the video shows her cursing, which is consistent with a belligerent attitude." The video is 38 seconds long, it is dark, and visibility is limited. It captures only brief glimpses of Purdy's demeanor after the assault. And it depicts her swearing. The brief glimpses of Purdy's demeanor are not necessarily inconsistent with her being irate and hostile during the period after her arrest. As a result, we cannot say that the trial court abused its discretion on this ground.

Purdy also contends the video of Greely allegedly chuckling after Wallace's statement, "You should've just let those people beat her ass," contradicts Greely's claim that her assault caused him temporary pain and soreness. While the trial court agreed the video might be probative of Greely's state of mind, it concluded that it is not probative as to Purdy's defense nor of whether Purdy caused Greely temporary injury. The chuckle in response to

Wallace's statement is not necessarily inconsistent with Greely's temporary pain. Again, we cannot say that the trial court abused its discretion.[7]

Second, we consider whether the trial court's ruling to exclude the video violated Purdy's right to present a defense and her right to a fair trial. We determine it did not.

"[A] defendant's Sixth Amendment rights are not absolute." State v. Case, 13 Wn. App. 2d 657, 669, 466 P.3d 799 (2020). "To show a Sixth Amendment violation, the excluded evidence must be of extremely high probative value." Id. at 670. "[I]t is not enough that the excluded evidence simply be relevant in that it makes a fact of consequence more or less probable." Id.

Purdy asserts that the video impeaches Greely's credibility as the State's central witness. Her defense theory is essentially that Greely "made up a false story that she assaulted him to justify the fact that she was injured." The trial court excluded the video in part because it found that Greely's chuckle had limited probative value as to Greely's state of mind when he took Purdy to the ground. It also found that the video did not support Purdy's theory that Greely lied about the incident "to avoid making a use of force report." The trial court determined the video had little probative value and did not make any fact more or less probable. The exclusion of the video did not prevent Purdy from arguing her trial theory. Based on the record before us, we cannot say that the video was of "extremely high probative value."

---

[7] Given our conclusion, we do not reach the State's contention that the video would have been prejudicial against it.

16

C. Right to a Fair Trial

Purdy contends the trial court's admission of Stiffarm's testimony, admission of her post-arrest statements to the officers, and exclusion of the video was unduly prejudicial and denied her the right to a fair trial. A trial court's erroneous admission of evidence is subject to the harmless error analysis. State v. Gunderson, 181 Wn.2d 916, 926, 337 P.3d 1090 (2014). An error is harmless "'unless, within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected.'" State v. Gresham, 173 Wn.2d 405, 425, 269 P.3d 207 (2012) (quoting State v. Smith, 106 Wn.2d 772, 780, 725 P.2d 951 (1986)). Because we do not see any evidentiary errors, we cannot conclude that the trial court denied Purdy her right to a fair trial.

D. Supervision Fees

Purdy says the trial court intended to waive all discretionary LFOs but inadvertently imposed supervision fees. We agree and remand for the trial court to strike the fees.

Because trial courts can waive supervision fees, they are discretionary LFOs. Dillon, 12 Wn. App. 2d at 152; RCW 9.94A.703(2). "Where the record demonstrates that the trial court intended to impose only mandatory LFOs but inadvertently imposed supervision fees, it is appropriate for us to strike the condition of community custody requiring these fees." State v. Peña Salvador, 17 Wn. App. 2d 768, 791–92, 487 P.3d 923 (2021) (citing Dillon, 12 Wn. App. 2d at 152); see also State v. Markovich, No. 81423-1-I, slip op. at 18 (Wash. Ct.

App. Aug. 2, 2021), https://www.courts.wa.gov/opinions/pdf/801562.pdf (holding similarly).

During sentencing, the court said, "I will find that Ms. Purdy is indigent for the purposes of legal financial obligations, impose *only* the $500 victim penalty assessment and the $100 DNA fee." (Emphasis added.) The trial court then used a form judgment and sentence with an appendix providing, "While on community custody, the defendant shall . . . pay supervision fees as determined by DOC."

In Dillon, we struck supervision fees because the record established that "the trial court intended to impose only mandatory LFOs." 12 Wn. App. 2d at 152; RCW 9.94A.703(2); see also Peña Salvador, 17 Wn. App. 2d at 792. At sentencing, the trial court said it would "'simply order $500 victim penalty assessment, which is still truly mandatory, as well as restitution, if any.'" Dillon, 12 Wn. App. 2d at 152. We concluded that this, along with the location of the prewritten language imposing supervision fees—in a separate section on community custody conditions—supported a remand for the supervision fees to be stricken. Id. Similarly, here, as for "legal financial obligations," the trial court stated its intent to "impose *only* the $500 victim penalty assessment and the $100 DNA fee." (Emphasis added.) The judgment and sentence's LFO section does not include an option for imposing supervision fees. As in Dillon, it appears the trial court inadvertently imposed the supervision fees by using a form judgment and sentence with prewritten language in the community custody conditions appendix.

The State asks us to disregard Dillon and instead follow Division Two's decision in State v. Starr, 16 Wn. App. 2d 106, 108, 479 P.3d 1209 (2021) (Worswck, J., concurring in part and dissenting in part). In Starr, the sentencing court stated, "The defendant is otherwise indigent. So no other costs will be assessed." Id. But the sentencing court did not strike the part of the boilerplate judgment and sentence imposing supervision fees. Id. On appeal, a majority of the panel observed that supervision fees do not constitute costs, and thus the sentencing court's statements did not necessarily show that it did not intend to impose such fees. Id. at 109. The dissenting judge agreed that such fees are not statutory costs, but believed that the sentencing court stated an intent not to impose the fees. Id. at 111. Starr does not apply here because the trial court stated its intent to waive all nonmandatory LFOs.

The State seems to argue that the written judgment and sentence controls over the trial court's oral statement. We rejected this argument in State v. Spieker, No. 80224-9-I, slip op. at 6 (Wash. Ct. App. Mar. 22, 2021) (unpublished), https://www.courts.wa.gov/opinions/pdf/802259.pdf, noting that the imposition of supervision fees through prewritten language is "more akin to a scrivener's error or clerical mistake than a contradictory statement."[8] The remedy for a "scrivener's error is remand to the trial court for correction of the

---

[8] See GR 14.1(c) ("Washington appellate courts should not, unless necessary for a reasoned decision, cite or discuss unpublished opinions in their opinions.").

judgment and sentence."[9]  Id. (citing In re Pers. Restraint of Mayer, 128 Wn. App. 694, 701–02, 117 P.3d 353 (2005)).

We remand for the trial court to strike the supervision fees and otherwise affirm.

_Chun, J._

WE CONCUR:

_Mann, C.J._                    _Dwyer, J._

---

[9] In the alternative, the State contends that if the judgment and sentence does not express the intent of the sentencing court, Purdy should have moved for relief under CrR 7.8(a).  But the State does not explain how this affects the appeal here.