**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| STATE OF WASHINGTON, | No. 86244-8-I |
| Respondent, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| RICARDO MEJIA, | |
| Appellant. | |

FELDMAN, J. — Ricardo Mejia appeals his convictions following a jury trial for three counts of theft in the first degree. On appeal, Mejia argues the trial court erroneously allowed the State to exercise a peremptory challenge contrary to GR 37 and excluded testimony in violation of his constitutional right to present a defense. He also claims the prosecutor committed reversible misconduct. We affirm.

I

Mejia's convictions arise out of an elaborate scheme to defraud six people by charging them tens of thousands of dollars for legal services that were never provided. According to Mejia, these legal services were to be provided by a California attorney, Eric Price, whose law firm employed his niece. But as Price would later testify, his firm never employed a relative of Mejia or performed any

work for the victims of his fraudulent scheme. Eventually, Mejia's conduct was reported to the police. Following an investigation, the State charged Mejia with three counts of theft in the first degree with a "major economic offense" aggravator.

The case proceeded to a jury trial. Prior to voir dire, the lead prosecutor, Christopher A. Fyall, informed the court that he and his co-counsel, Salvador Segura-Sanchez, recognized juror 51 from a recent trial. Fyall recalled juror 51 "was a witness" in that trial, "did not respond to her subpoena," "was arrested on a material witness warrant," "spent a night in jail prior to her testimony," and then testified while Fyall and Segura-Sanchez were in the courtroom. Fyall asked the court to excuse juror 51 for cause because, "I believe there's every reason to believe that she would recognize us when she sees us, and that she could not give us a fair trial under the circumstances." The trial court denied Fyall's request, stating, "I'm not going to just excuse at this point. . . . We'll do individualized questioning with [juror] 51."

During Fyall's individualized questioning of juror 51, the following exchange occurred:

> Q: Juror 51, . . . I recognized your name. I want to ask, . . . did you testify in the [previous defendant's][1] homicide trial this summer?
>
> A: Yes.
>
> Q: Okay. Thank you. And you were brought to court by sheriffs who arrested you at your home, correct?
>
> A: Yes.

---

[1] We omit the name of the defendant in the previous trial to protect juror 51's privacy, and we omit the names of the victims of Mejia's theft for the same reason.

> Q: Okay. . . . [Y]ou may or may not recognize my face, but I recognized your name. I was one of the prosecutors on that case. And I – I don't know. Do you recognize my face?
>
> A: No.
>
> Q: Okay. Do you think that that was a negative experience for you?
>
> A: Say that again.
>
> Q: Was that a negative experience for you, being arrested and brought to court?
>
> A: Yes.
>
> Q: Do you think that that's something that you could set aside while being a juror in this case?
>
> A: Yes.
>
> Q: Do you think – you don't think that it would influence you in any way?
>
> A: No.

After this exchange, Fyall moved again to strike juror 51 for cause.

In response to Fyall's motion, defense counsel asked juror 51, "understanding that it may have been a bad experience for you, are you able just to put that aside if the judge tells you to be fair and impartial to this case?" Juror 51 replied, "Yes," and defense counsel then objected to the State's for-cause challenge. The court returned juror 51 to the jury pool and then denied the State's for-cause challenge, reasoning that "while I understand the State's concerns, I don't think we have enough testimony to establish a for-cause [challenge]" because juror 51 "said that she can put it aside." The court told Fyall he was "free to look into it further." Fyall then asked whether additional questioning of juror 51

would be outside the presence of the other jurors, to which the court replied, "[T]his is your opportunity to . . . . inquire individually. And so I will leave that to you."

Later that day, Fyall further "advised [the court] of [his] personal knowledge of [juror 51]." He recounted that his "relationship with [juror 51] was rather fraught" because "[s]he was a hostile witness in our [previous] trial" and was impeached by the prosecution for giving conflicting testimony. Fyall then asserted that "as a prosecutor with potentially having [juror 51] be someone whom I am trying to commit to a story in front of the entire jury, I don't think that's possible" because "I don't think there's any objective person who understands [juror 51] the way I do who thinks she can be a fair juror on a case that I have." The trial court told Fyall it "underst[ood] being in your shoes the concerns that you likely have," and it noted, "You may be able to develop a for-cause through the course of this questioning," but it concluded it, "With what was presented to me, it just wasn't enough based on what this Court was able to view."

Fyall then stated that, based on juror 51's unwillingness to be "forthright" with the prosecution in the previous trial, he would not question her further because he believed she would not answer his questions "truthfully." Fyall explained that further questioning would "go south for me just like her trial testimony went south" and "taint this entire pool in a way that I'm not going to be able to unring that bell." Fyall also stated if juror 51 was not removed for cause, he "absolutely will be moving to pre-empt [juror 51] based on . . . her conduct and what just happened to her four months ago" in the previous trial. The trial court responded, "Should you exercise your peremptory [challenge], the Court is aware of what you have

represented here. And I'm sure we will take that – we may take that into whatever consideration we need to give it when we get to that analysis."

The next morning, Fyall filed a written "Motion to Strike Juror 51 for Implied Bias" and submitted a declaration recounting additional facts from the previous trial. According to Fyall's declaration, the defendant in that trial was charged with felony murder and unlawful possession of a firearm, juror 51 was the defendant's current girlfriend or ex-girlfriend, and Fyall was co-counsel for the prosecution. Fyall also stated the prosecution in the previous trial sought to introduce a recording of a phone call between juror 51 and a jail inmate made shortly after the victim's death in which juror 51 purportedly "indicated that [the defendant] told her that he shot somebody downtown." According to Fyall, during a phone call between juror 51, Fyall, and the lead prosecutor before trial, juror 51 "[u]sing very hostile language . . . made clear to me and [the lead prosecutor] that she did not want to participate in the prosecution . . . and that she would not cooperate with her subpoena."

Fyall then stated that juror 51 was arrested on a material witness warrant, booked into jail, and compelled to testify. Fyall recounted that juror 51 "demonstrated hostility toward the prosecution" during her testimony "by repeatedly answering that she could not recall events." Fyall also averred that juror 51 gave conflicting testimony because she initially "denied remembering the existence of any jail phone call" in front of the jury, then "acknowledged that she recognized her voice on the recording" after it was played for her outside the presence of the jury, but after the jury was called back in "denied recognizing her

- 5 -

own voice" and "further denied testifying minutes earlier that she *did* recognize her own voice." Fyall asserted that based on her inconsistent testimony, the judge in the previous trial permitted the State to impeach juror 51. The defendant was ultimately convicted and sentenced to 37 years in prison.

Based on these "extraordinary circumstances," Fyall argued the trial court should strike juror 51 for cause due to implied bias. Given his role in compelling juror 51's testimony and convicting her ex-boyfriend[2] in the previous trial, Fyall posited, "There would be no quicker way for [juror 51] to get back at the State than to participate as a biased juror in this trial, and thereby undermine this prosecution." Fyall continued, "While [juror 51] disclaimed any such inclination, this Court should evaluate that claim skeptically" due to her previous "willingness to ignore the obligation to speak truthfully while under oath." At oral argument on the State's motion, Mejia did not dispute Fyall's recitation of the facts regarding juror 51's conduct in the previous trial but nonetheless opposed the motion because juror 51 said she is "not going to hold it against [Fyall]" and "can be fair and impartial." The trial court denied the State's motion, reasoning that although "there is an adversarial relationship between the prosecutor's office and this prospective juror. . . . I have not seen from the testimonies in this case . . . that that will carry over to bias against Mr. Mejia and will unfairly inject that bias into this process."

Later that day, the State exercised a peremptory challenge to juror 51. The trial court then noted that juror 51 is a "person of color," at which point Mejia raised

---

[2] Both parties refer to the defendant in the previous trial as juror 51's "ex-boyfriend."

a GR 37 objection. In response, Fyall provided the following reasons for the challenge:

> I have filed a motion to strike Juror 51 for implied bias. It makes abundantly clear this is a challenge against this specific individual for their adversarial relationship the Court had found and the prior ruling that the Court – or that the witness had an adversarial relationship in that case with the prosecutor's office and perhaps with me. Not seen as applied to this case specifically, but given that relationship, given the concerns I have made abundantly clear throughout the procedure, I don't believe any objective observer would believe it's anything other than the reasons I have given, which are manifold, and not racial discrimination.

Fyall later clarified he was not seeking to strike juror 51 because "she has a close relationship . . . with someone who has a criminal conviction," but rather because "that individual [referring to the person with a criminal conviction] is someone I have prosecuted and sent to prison." The court overruled Mejia's GR 37 objection and granted the State's peremptory challenge.

At trial, Mejia attempted to elicit testimony from Price regarding whether a crime of dishonesty, such as theft, would constitute a "crime[] involving moral turpitude" that would subject Mejia to deportation if he were convicted. The trial court sustained the State's relevance objection to this line of questioning. During closing argument, Mejia argued that "it was someone from Eric Price's law firm who put together this elaborate scheme" and was "scamming these people along with Mr. Mejia," who "thought he was actually helping these people." In rebuttal, the prosecution stated that "[a]fter [Mejia] was arrested, he didn't say anything about being duped" and "declined" to "make the claims" asserted by defense counsel in his closing argument. The jury convicted Mejia as charged, and he now appeals.

II

Mejia first argues the trial court erred by allowing the State to exercise a peremptory challenge contrary to GR 37. We disagree.

A

The purpose of GR 37 is to "eliminate the unfair exclusion of potential jurors based on race or ethnicity" through the use of peremptory challenges. GR 37(a). Under GR 37(c), "[a] party may object to the use of a peremptory challenge to raise the issue of improper bias." Upon such an objection, "the party exercising the peremptory challenge shall articulate the reasons the peremptory challenge has been exercised." GR 37(d). The court "shall then evaluate the reasons given to justify the peremptory challenge in light of the totality of circumstances." GR 37(e). The court "shall" deny the challenge if it determines "an objective observer could view race or ethnicity as a factor in the use of the peremptory challenge." *Id.* "[A]n objective observer is aware that implicit, institutional, and unconscious biases, in addition to purposeful discrimination, have resulted in the unfair exclusion of potential jurors." GR 37(f).

GR 37(g) provides a non-exhaustive list of "circumstances the court should consider" in ruling on a GR 37 objection, and GR 37(h) sets forth seven reasons for a peremptory challenge that are "presumptively invalid." Because the GR 37(h) reasons are potentially dispositive, we discuss those reasons first in section II.B below. We then turn to the GR 37(g) circumstances in section II.C below. We review the trial court's GR 37 rulings de novo because we "'stand[] in the same position as does the trial court' in determining whether an objective observer could

conclude that race was a factor in the peremptory strike." *State v. Tesfasilasye*, 200 Wn.2d 345, 355-56, 518 P.3d 193 (2022) (quoting *State v. Jefferson*, 192 Wn.2d 225, 250, 429 P.3d 467 (2018)).[3]

B

Mejia argues we must reverse his convictions because the State exercised a peremptory challenge against juror 51 for two reasons that are presumptively invalid under GR 37(h):  (1) "having prior contact with law enforcement officers" and (2) "having a close relationship with people who have been stopped, arrested, or convicted of a crime."  *See* GR 37(h)(i), (iii).  Mejia asserts the State improperly struck juror 51 for the first reason because it relied on her "one unpleasant and forced interaction with the criminal legal system."  And Mejia asserts the State improperly struck juror 51 for the second reason because it relied on her "reluctance in helping the State convict [her] loved one[]," referring to her ex-boyfriend convicted in the previous trial.[4]

These arguments are unconvincing.  GR 37 was enacted to combat the historical use of peremptory challenges "based largely on racial stereotypes or generalizations."  *Tesfasilasye*, 200 Wn.2d at 356.  In drafting GR 37, the Supreme Court included these "presumptively invalid" reasons for striking jurors because

---

[3] Our Supreme Court has noted "further refinement" of this standard of review may be appropriate in cases involving "actual findings of fact" or a "trial court's determinations . . . [that] depended on an assessment of credibility."  *Tesfasilasye*, 200 Wn.2d at 356.  We decline to apply a deferential standard of review in this case because both parties agree we should review the trial court's GR 37 ruling de novo and neither party has identified any finding that could be entitled to deference.

[4] The five other presumptively invalid reasons are "(ii) expressing a distrust of law enforcement or a belief that law enforcement officers engage in racial profiling; . . . (iv) living in a high-crime neighborhood; (v) having a child outside of marriage; (vi) receiving state benefits; and (vii) not being a native English speaker."  GR 37(h).  Mejia does not argue that the State's reasons for striking juror 51 resemble any of these presumptively invalid reasons.

they "have been associated with improper discrimination in jury selection." GR 37(h). The court has observed that the GR 37(h) reasons "are not accurate indicators of a person's fitness to serve as a juror" because "[o]ur Black, Indigenous, and other People of Color communities are arrested, searched, and charged at significantly higher rates than White communities, and therefore are more likely to know someone who has a close relationship with someone who has had contact with the criminal legal system." *Tesfasilasye*, 200 Wn.2d at 358.

Here, Fyall's reasons for striking juror 51 are not based on racial stereotypes or generalizations. Instead, Fyall's reasons relate to a specific experience in a criminal proceeding involving himself, juror 51, and her ex-boyfriend. Fyall had personally interacted with juror 51 in his capacity as a prosecutor in the previous trial, observed her conduct in that trial (including failing to comply with a subpoena and providing conflicting testimony), and successfully prosecuted her ex-boyfriend. Fyall specified that his reason for striking juror 51 "isn't that she has a close relationship, as contemplated by the rule [GR 37(h)(iii)], with someone who has a criminal conviction. Instead it's about the fact that that individual is someone I have prosecuted and sent to prison." These reasons for striking juror 51—relating to her specific conduct and interactions with Fyall in the previous trial—do not implicate GR 37(h)(i) and (iii).

Mejia's contrary arguments misapply GR 37(h). Mejia argues GR 37(h)(iii) "presumptively prohibits" challenging "any person convicted of a 'crime of dishonesty' or any person who recants at trial" based on the "assumption that if a person is dishonest once, she is perpetually dishonest." The text of GR 37(h)(iii)—

which refers to a juror's "relationship with people who have been stopped, arrested, or convicted of a crime"—contains no such prohibition on striking a juror due to their prior dishonesty, and Mejia provides no authority suggesting that striking jurors for previously providing conflicting testimony has "been associated with improper discrimination in jury selection." *See* GR 37(h). Mejia also argues the State's reasons for striking juror 51 are presumptively invalid because "[j]uror 51 assured the court that despite being jailed and forced to testify at her ex-boyfriend's trial, she could follow the court's instructions and be fair and impartial." This argument erroneously conflates for-cause and peremptory challenges. *See State v. Hale*, 28 Wn. App. 2d 619, 636-37, 537 P.3d 707 (2023) ("whether a juror would be subject to a for cause challenge . . . cannot be the test" for whether a peremptory challenge violates GR 37). Contrary to Mejia's argument, juror 51's statement that she could remain fair and impartial did not preclude the State from exercising a peremptory challenge against her.

In sum, we conclude the State's reasons for striking juror 51 were not presumptively invalid under GR 37(h).

C

Turning to GR 37(g), this rule provides a non-exhaustive list of five "circumstances the court should consider" in determining whether an objective observer could view race or ethnicity as a factor in the use of a peremptory challenge. Our Supreme Court has stressed that GR 37(g) "is not a checklist for trial courts to cross off but, instead, factors to be considered in making a determination." *Tesfasilasye*, 200 Wn.2d at 358. Because GR 37(e) requires

courts to evaluate the reasons given to justify the peremptory challenge in light of the totality of the circumstances, "we give equal weight to all of the evidence when determining whether race 'could' have been a factor." *State v. Booth*, 22 Wn. App. 2d 565, 573, 510 P.3d 1025 (2022).

Three of the GR 37(g) circumstances are relevant here:

(i) the number and types of questions posed to the prospective juror, which may include consideration of whether the party exercising the peremptory challenge failed to question the prospective juror about the alleged concern or the types of questions asked about it;

. . .

(iv) whether a reason might be disproportionately associated with a race or ethnicity; and

(v) whether the party has used peremptory challenges disproportionately against a given race or ethnicity, in the present case or in past cases.

GR 37(h). We analyze these circumstances below to determine whether, in light of the totality of circumstances, an objective observer could view race or ethnicity as a factor in the State's use of a peremptory challenge against juror 51.[5]

1

Regarding GR 37(g)(i)—which generally concerns the number and types of questions posed to the prospective juror—after Fyall recognized juror 51's name, he questioned her outside the presence of the other venire members. During this questioning, Fyall posed seven questions to juror 51, including whether she

---

[5] The two other GR 37(g) circumstances are "(ii) whether the party exercising the peremptory challenge asked significantly more questions or different questions of the potential juror against whom the peremptory challenge was used in contrast to other jurors" and "(iii) whether other prospective jurors provided similar answers but were not the subject of a peremptory challenge by that party." The parties do not ask us to analyze either of these circumstances. Moreover, the record does not implicate circumstances (ii) or (iii) because no other jurors were uniquely situated like juror 51 and, thus, were not questioned as she was.

testified in the previous trial, whether she was arrested and brought to court, whether she recognized Fyall, whether being arrested and brought to court was a "negative experience," whether she "could set [that negative experience] aside while being a juror in this case," and whether that negative experience "would influence [her] in any way." Because Fyall asked juror 51 numerous questions that directly related to his stated concerns—whether juror 51 was the recalcitrant witness in the previous trial and whether that experience would influence her service as a juror in Mejia's case—this circumstance weighs against concluding race could have been a factor in the use of the peremptory challenge.

Mejia counters that this circumstance weighs in favor of concluding race could have been a factor because, "[a]fter trying and failing" to "buil[d] a record that was sufficient to establish a for-cause challenge or [overcome] a GR 37 challenge," Fyall "made the deliberate choice not to further question Juror 51." This argument is unpersuasive because Fyall provided legitimate reasons for not asking additional questions of juror 51. After the trial court denied Fyall's initial for-cause challenge, it did not allow him to conduct further individualized questioning of juror 51 and, instead, indicated that any such questioning would need to occur in front of the other venire members. Fyall declined to engage in such questioning because he believed juror 51 would not "be forthright with me" and any additional questioning would "go south for me just like her trial testimony [in the previous trial] went south" and "taint this entire pool in a way that I'm not going to be able to unring that bell." The trial court recognized the validity of Fyall's reasoning, stating: "There was a strategic choice by the prosecutor to limit the questions that he did

at that particular time. I understand reasons why that might be. And I understand reasons why it might not be brought further up in the group setting." On this record, circumstance GR 37(g)(i) weighs against concluding race could have been a factor in the use of the peremptory challenge.

2

Regarding GR 37(g)(iv)—whether a reason might be disproportionately associated with a race or ethnicity—courts are skeptical of "nebulous," "vague," and "unsubstantiated" reasons for challenging a juror because they "might mask conscious or unconscious bias." *State v. Omar*, 12 Wn. App. 2d 747, 754, 460 P.3d 225 (2020) (citing *Jefferson* 192 Wn.2d at 251). Conversely, courts are less likely to find a GR 37 violation where the proffered reasons for challenging a juror are "legitimate" and not based on "race or racial stereotypes." *Hale*, 28 Wn. App. 2d at 638-39. Here, in exercising the peremptory challenge against juror 51, Fyall referred to his previously filed "motion to strike Juror 51 for implied bias" and stated that it "makes abundantly clear this is a challenge against this specific individual for their adversarial relationship . . . in that [previous] case with the prosecutor's office and perhaps with me." Fyall also referred to the "concerns I have made abundantly clear throughout the procedure."

Fyall's reasons for seeking to strike juror 51 are based on specific facts as opposed to racial stereotypes. Fyall noted that juror 51 had "recently lied under oath" and "fail[ed] to comply with a lawful subpoena" in the previous trial. Additionally, Fyall was a prosecutor in the previous trial and, as a result, personally spoke with juror 51 and witnessed her conduct during that trial. Division III of our

court recently observed that a prosecutor's adversarial relationship with a prospective juror in a previous criminal proceeding is a "race-neutral justification" supporting a peremptory challenge. *See State v. Orozco*, 19 Wn. App. 2d 367, 376, 496 P.3d 1215 (2021). Based on his interactions with juror 51 in that previous trial, Fyall explained he was concerned that juror 51, despite her assertions otherwise, still harbored animosity toward him and could not set those feelings aside during Mejia's trial. These reasons weigh against concluding race could have been a factor in the use of the peremptory challenge.

Notwithstanding the above analysis, Mejia argues "the prosecutor's claim that Juror 51 lied in order to get on the jury and sabotage the State invoked a harmful stereotype about Black women" being "'untrustworthy' and 'deceptive'" and that by using the term "hostile" to describe juror 51's conduct in the previous trial, Fyall evoked "the harmful stereotype of an 'angry Black woman.'" Neither argument is persuasive here. The phrase "hostile witness" is routinely used in legal proceedings to refer to "[a] witness who is biased against the examining party, is unwilling to testify, or is identified with an adverse party." BLACK'S LAW DICTIONARY 1926 (12th ed. 2024); *see also* ER 611(c) (allowing a party to ask leading questions of "a hostile witness"). While we recognize there are circumstances where words like "hostile," "combative," and "confrontational" can be used to project a racial stereotype,[6] Fyall's word choice here was consistent

---

[6] *See State v. Hawkins*, 200 Wn.2d 477, 500 n.17, 519 P.3d 182 (2022) (recognizing that describing Black women as "hostile," instead of "neutrally recounting the facts" of the prior conduct, is "concerning and harmful" because it perpetuates the stereotype that Black women are "violent, hostile, and aggressive") (internal quotation marks omitted); *Henderson v. Thompson*, 200 Wn.2d 417, 436, 518 P.3d 1011 (2022) (observing that the terms "combative" and "confrontational" "evoke the harmful stereotype of an angry BLACK woman") (internal quotation marks omitted).

with established legal terminology and supported by *specific* facts, including juror 51's conduct in the previous trial and her interactions with Fyall and his co-counsel. Thus, Mejia has not persuaded us that circumstance GR 37(g)(iv) weighs in favor of concluding race could have been a factor in the use of the peremptory challenge.

3

Lastly, as to GR 37(h)(v)—whether the party has used peremptory challenges disproportionately against a given race or ethnicity in the present case or in past cases—nothing in the record suggests Fyall used peremptory challenges disproportionately against a given race or ethnicity in Mejia's trial or has done so in past cases. To the contrary, Fyall made no attempt to strike any other venire members who identified as Black or African American. Fyall completed jury selection without using all of his peremptory strikes, and seven members of the petit jury that heard Mejia's case identified as members of racial or ethnic minority groups, including two who identified as Black or African American. Therefore, circumstance GR 37(g)(v) weighs against concluding race could have been a factor in the use of the peremptory challenge.

D

Based on the totality of the circumstances, an objective observer could not view race or ethnicity as a factor in the use of the State's peremptory challenge against juror 51. The GR 37(g) circumstances weigh against concluding race could have been a factor. Additionally, the record does not support Mejia's argument that the State's reasons for striking juror 51 are presumptively invalid under GR 37(h). On balance, the record shows the State challenged juror 51 due

to Fyall's personal knowledge of her specific conduct in the previous trial and relationship with her stemming from their involvement in that trial, as opposed to racial stereotypes or generalizations. Thus, the trial court did not err in granting the State's peremptory challenge against juror 51 over Mejia's GR 37 objection.

III

Mejia next argues the trial court erroneously excluded testimony in violation of his constitutional right to present a defense. We disagree.

"'A criminal defendant's right to present a defense is guaranteed by both the federal and state constitutions.'" *State v. Butler*, 200 Wn.2d 695, 713, 521 P.3d 931 (2022) (quoting *State v. Jennings*, 199 Wn.2d 53, 63, 502 P.3d 1255 (2022)). We apply a two-step analysis to determine whether the exclusion of evidence violates that right. *State v. Arndt*, 194 Wn.2d 784, 797-98, 453 P.3d 696 (2019). In step one, we review the evidentiary ruling for abuse of discretion. *Id*. at 797. "'A trial court abuses its discretion when its decision is manifestly unreasonable or exercised on untenable grounds or for untenable reasons.'" *Id.* at 799 (quoting *State v. Lord*, 161 Wn.2d 276, 283-84, 165 P.3d 1251 (2007)). In step two, we consider de novo whether the ruling deprived the defendant of their constitutional right to present a defense. *Id*. at 797-98.

Here, Mejia attempted to elicit testimony from Price regarding whether the crimes for which he was charged are "crimes of moral turpitude" that would subject him to deportation if he were convicted. Mejia's justification for asking this question was to "show that there was a disincentive for him to do something like this." The prosecutor objected on relevance grounds, claiming "the defense is attempting to

backdoor into the jury's mind the consequences of the penalty that might be at issue in this case." The trial court sustained the State's objection due to the "potential prejudice that might come from this particular line of questioning and confusion it might cause the jury."

Regarding step one, the trial court did not abuse its discretion in excluding the above evidence on relevance grounds. Evidence is admissible only if it is relevant, meaning it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401, 402. Because the jury's "sole function is to decide the defendant's guilt or innocence," it "should 'reach its verdict without regard to what sentence might be imposed.'" *State v. Rafay*, 168 Wn. App. 734, 776, 285 P.3d 83 (2012). Moreover, even if relevant, the trial court may exclude evidence if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." ER 403. "[P]roviding jurors sentencing information invites them to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion." *Shannon, v. U.S.*, 512 U.S. 573, 579, 114 S. Ct. 2419, 129 L. Ed. 2d 459 (1994).

In light of the legal authority discussed above, evidence relating to Mejia's risk of deportation was not relevant in his trial because it related to a punishment he could receive following a conviction rather than whether he committed the crimes for which he was charged. The trial court correctly concluded that inviting jurors to consider the potential immigration consequences Mejia could face if

convicted would confuse the jurors by distracting them from their factfinding role. Accordingly, the trial court did not abuse its discretion in sustaining the State's relevance objection to Price's testimony that Mejia could be subject to deportation if he were convicted.

Mejia argues a different rule should apply based on *State v. Bedada*, 13 Wn. App. 2d 185, 463 P.3d 125 (2020). Contrary to Mejia's argument, *Bedada* did not abrogate the general rule that jurors may not consider evidence of potential consequences that stem from a defendant's convictions. Instead, *Bedada* acknowledged a narrow exception where the defendant seeks to introduce the topic of "a witness's subjective belief that a defendant might face a specific consequence if the witness complains to the police or testifies at trial." *Id.* at 203. Unlike in *Bedada*, where the defendant attempted to use evidence of his at-risk immigration status to demonstrate bias or prejudice of a *witness*, Mejia sought to argue that his at-risk immigration status deterred *himself* from acting unlawfully. *Bedada* does not sanction this use of evidence regarding immigration status. Nor does Mejia argue Price's testimony was admissible under ER 413,[7] which was central to the *Bedada* court's analysis. 13 Wn. App. 2d at 194. *Bedada* is inapposite here.

Turning to the second step of the right to present a defense analysis, Mejia fails to show the trial court's evidentiary ruling violated his constitutional right to present a defense. The second step is not "merely a repetition of the analysis

---

[7] ER 413 states in relevant part that "evidence of a party's . . . immigration status shall not be admissible unless immigration status is an essential fact to prove an element of, or a defense to, the criminal offense with which the defendant is charged, or to show bias or prejudice of a witness pursuant to ER 607." ER 413(a).

undertaken at step one." *State v. Ritchie*, 24 Wn. App. 2d 618, 629, 520 P.3d 1105 (2022). Instead, the "right to present a defense" is concerned with "whether there is a unique or aberrant rule that results in the defendant having a lesser Sixth Amendment right than that possessed by citizens in other jurisdictions or persons charged with a different crime in the same jurisdiction." *Id.* Also, "Defendants have a right to present only relevant evidence, with no constitutional right to present irrelevant evidence." *State v. Jones*, 168 Wn.2d 713, 720, 230 P.3d 576 (2010). Mejia fails to squarely address this constitutional analysis and instead argues the evidence at issue was relevant, which, as discussed above, it was not. Mejia's constitutional argument thus fails.

IV

Lastly, Mejia argues the prosecutor committed reversible misconduct. We disagree.

A

In closing argument, Mejia's attorney argued "it was someone from Eric Price's law firm who put together this elaborate scheme" and was "scamming these people along with Mr. Mejia," who "thought he was actually helping these people." In rebuttal, the prosecutor argued "Mejia never once claimed that he was duped," "After he was arrested, he didn't say anything about being duped," and "At no point, has he ever claimed that he thought he was acting lawfully." Mejia did not object below to the prosecutor's statements. He now argues for the first time on appeal that the above statements improperly commented on his constitutional right to

remain silent because the prosecutor "argue[d] that Mr. Mejia did not tell the police the law firm scammed him."

To prevail on his prosecutorial misconduct claim, Mejia must show the prosecutor's statements were "both improper and prejudicial in the context of the entire record and the circumstances at trial." *State v. Zwald*, 32 Wn. App. 2d 62, 74, 555 P.3d 467 (2024). Where, as here, the defendant did not object at trial, "the defendant is deemed to have waived any error, unless the prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." *State v. Emery*, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012). "Under this heightened standard, the defendant must show that (1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.'" *Id.* (quoting *State v. Thorgerson*, 172 Wn.2d 438, 455, 258 P.3d 43 (2011)). "In evaluating whether the defendant has overcome waiver in cases where an objection was not lodged, we will 'focus less on whether the prosecutor's conduct was flagrant or ill intentioned and more on whether the resulting prejudice could have been cured.'" *State v. Gouley*, 19 Wn. App. 2d 185, 201, 494 P.3d 458 (2021) (quoting *Emery*, 174 Wn.2d at 762).

Mejia's prosecutorial misconduct claims fails because even if he could show the prosecutor's statements improperly commented on his right to remain silent, he has not shown the statements were so flagrant and ill intentioned that an instruction could not have cured any resulting prejudice. Had Mejia objected, the trial court could have sustained the objection, directed the prosecutor to avoid any

further statements that could potentially comment on Mejia's right to remain silent, and instructed the jury that it must not use Mejia's silence as evidence of substantive guilt or to prejudice him in any way. We presume the jury would have followed such an instruction. *See id.* at 203-04. Because Mejia fails to show any resulting prejudice could not have been cured, his prosecutorial misconduct argument "'necessarily fails, and our analysis need go no further.'" *Id.* at 201 (quoting *Emery*, 174 Wn.2d at 764).

Mejia contends Washington cases "have held that a defendant can raise an unpreserved argument regarding a prosecutor's improper comment on the right to remain silent under RAP 2.5(a)(3) without having to discuss the flagrant and ill-intentioned standard." In one such case cited by Mejia, the Supreme Court noted that for the defendant to argue on appeal for the first time that a detective's testimony during trial and prosecutor's reference to that testimony in closing argument improperly commented on his right to remain silent, he "must establish that the alleged constitutional error was manifest" under RAP 2.5(a)(3). *State v. Gregory*, 158 Wn.2d 759, 837, 147 P.3d 1201 (2006), *abrogated on other grounds by State v. Gregory*, 192 Wn.2d 1, 427 P.3d 621 (2018). And in another case, the defendant argued the State improperly commented on his silence by eliciting testimony about his silence from a detective and then urged the jury in closing argument to use this testimony to link the defendant's silence with guilt. *State v. Chuprinov*, 32 Wn. App. 2d 508, 516-17, 556 P.3d 1127 (2024). We held the defendant could raise this argument for the first time on appeal under RAP 2.5(a)(3). *Id.* at 515.

- 22 -

*Gregory* and *Chuprinov* are distinguishable because they addressed situations in which the prosecutor *both* improperly elicited evidence at trial regarding the defendant's silence *and* used that evidence in closing argument as substantive evidence of guilt. In contrast, Mejia's prosecutorial misconduct claim solely concerns the prosecutor's statements during closing argument. As our Supreme Court has emphasized, "[o]ur standards of review are based on a defendant's duty to object to a prosecutor's allegedly improper argument" because "[o]bjections are required not only to prevent counsel from making additional improper remarks, but also to prevent potential abuse of the appellate process." *Emery*, 174 Wn.2d at 761-62. Therefore, we apply the heightened standard of review to Mejia's prosecutorial misconduct claim and conclude the challenged statements, even if improper, were not so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice.

B

Mejia also asserts two claims of prosecutorial misconduct in his statement of additional grounds. First, he states, "The Court should reverse Mr. Mejia's convictions because the prosecutor engaged in misconduct by engaging in retaliatory prosecution by seeking a higher sentence because Mr. Mejia exercised his right to a fair trial." Second, he states, "The court should reverse Mr. Mejia's convictions because the prosecutor engaged in misconduct by failing to disclose evidence that could exonerate the defendant." We reject both arguments pursuant to RAP 10.10(c), which provides that "the appellate court will not consider a defendant's statement of additional grounds for review if it does not inform the

- 23 -

court of the nature and occurrence of alleged errors." Neither of Mejia's arguments, quoted in full above, sufficiently inform us of the nature and occurrence of the alleged errors. In any event, we have carefully reviewed the record and it does not support either argument.

Affirmed.

_Feldman, J._

WE CONCUR:

_Coburn, J._                    _____, ACJ