IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 40271-1-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| KYLE FREDERICK VELA, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, C.J. — Kyle Vela appeals after a jury convicted him of one count of first degree rape of a child and one count of first degree child molestation. He contends the trial court erred in admitting ER 404(b) evidence, abused its discretion in admitting child hearsay evidence, and insufficient evidence supports the jury's finding of an aggravating factor. We agree with his first argument and reverse and remand for a new trial. We decline to address Vela's other arguments because they are rendered moot by our reversal of his convictions.

No. 40271-1-III
*State v. Vela*

FACTS

Ms. V. is the mother of three children, including A.V.[†] Kyle Vela is their biological father. Vela and Ms. V. began dating when she was 16 and she became pregnant with A.V. soon after. Vela was in and out of their lives, and they only lived as a family when Ms. V. was pregnant with A.V. and when A.V. was one or two years old. From the beginning, Ms. V.'s father never liked Vela. Ms. V.'s father would often joke about killing Vela and made his displeasure known to the children.

In May 2017, Vela was sentenced to two counts of possession of depictions of minors engaged in sexually explicit conduct. He was sentenced to 36 months of incarceration, 36 months of community custody, and ordered to register as a sex offender.

Between early August and mid-October 2022, Ms. V., Vela, and their three children stayed in temporary housing. A.V. was then eight years old. In early August,[1] A.V. told her parents she was uncomfortable down below. Vela showed Ms. V. that A.V.

___

[†] To protect the privacy interests of the minor child and her mother, we use their initials throughout this opinion. Gen. Order 2012-1 of Division III, *In re the Use of Initials or Pseudonyms for Child Victims or Child Witnesses*, (Wash. Ct. App. June 18, 2012), https://www.courts.wa.gov/appellate_trial_courts/?fa=atc.genorders_orddisp&ordnumber=2012_001&div=III.

[1] Ms. V. testified that A.V.'s pinworm infection was in September, but medical records from the hospital visit place it on August 5, 2022.

had pinworms. Ms. V. could see the pinworms near A.V.'s privates. Vela tried to pull the pinworms away from A.V.'s privates, but she started crying and said it hurt so he stopped. Because they were worried, they took A.V. to a hospital clinic, but no evidence of pinworms was found. However, the next morning, they went to Rite Aid, got medicine for pinworms, and within a couple days, the pinworms and A.V.'s symptoms were gone.

In September, Ms. V. called the school where A.V. and her younger brother attended and asked the staff to tell A.V. and her brother that Vela would be picking them up at the bus stop that day. When told, the children started crying, saying they were scared of their dad and refused to get on the bus. This reaction caused a counselor so much concern that she requested a welfare check.

The investigating officer assigned to the welfare check ran Vela's name through the local law enforcement database and found a felony warrant for failing to register as a sex offender. The officer drove to the bus stop and found Vela waiting. The officer advised Vela there was a warrant out for his arrest and arrested Vela. In the search incident to arrest, the officer found a pair of children's underwear in Vela's front pants pocket. Vela stated that it must have gotten mixed in with his clothes in the wash.

The officer gave the underwear to Ms. V. when she arrived. Later that day, Ms. V. called the officer because she wanted to give him additional information about the

underwear.  Ms. V. was confused as to why A.V.'s underwear was in Vela's pocket and told the officer that the underwear was dirty.  She said that Vela was a "panty sniffer." 2 Rep. of Proc. (RP) (Jan. 8, 2024) at 605.  Later that day, Ms. V. and the children went to her parents' house and she left the children with her father for a couple of hours.

In mid-October, Ms. V. and the children moved to their new long-term apartment. Vela no longer lived with them.  After moving to the new apartment, A.V. told her mother that Vela had touched her privates.  Ms. V. was shocked.  She asked Lorri Ledgerwood, a school counselor where A.V. attended school, to speak with A.V.

The same day, Ms. Ledgerwood brought A.V. into her office and talked to her about what she had told her mother.  A.V. said that sometimes when Ms. V. was not home, Vela licked her privates.  A.V. also told her that Vela had played with her in bed and touched her at her mother's friend's house.  Because of A.V.'s statements, Ms. Ledgerwood called Child Protective Services (CPS) and reported what A.V. had told her.

The same day, Ms. V. called the police and told them what A.V. had said.  Ms. V. told the officer that A.V. had told her that Vela had licked her privates, that A.V. told him to stop because she did not like it, and that Vela told A.V. not to tell anyone.

Ms. V. also took A.V. to the hospital to be examined.  At the hospital, Officer Zach Yates spoke with A.V.  A.V. told Officer Yates that Vela had exposed his private

parts and placed them on, or near, her private parts. A.V. also disclosed that when she had pinworms, Vela put his fingers into her vagina.

About one week later, in early November, Ms. V. took A.V. to be interviewed by Mari Murstig, a child forensic interviewer. Ms. Murstig interviews children when there is a concern of abuse. Throughout the interview, Ms. Murstig used prompts such as "tell me" and "what happened next" to get A.V. to describe in her own words what happened. A.V. said that while they were staying at a hotel and her mother was in the shower, Vela licked her privates. Next, while Ms. V. and her brother were laying down, Vela took a shower with A.V., asked her to lay down, and he licked her privates again. When asked to explain further, A.V. said when she had pinworms, Vela put his hands on her privates and then told her to go into the bath. Once there, he touched her privates, and when A.V. asked him to stop, he said he was her parent and continued.

When Ms. Murstig asked A.V. to explain further about when Vela licked her privates, A.V. said he pulled her pants down and went down to lick her. A.V. said it was ticklish. Vela told A.V. not to tell on him, warning that he would spank her if she did. Later, Vela asked A.V. if she wanted to take a shower, she said no, but he made her take one with him anyway. In the shower, Vela picked A.V. up and put his privates close enough to hers that they touched.

As a result of the interview and the previous reports, law enforcement arrested Vela. While in the jail's holding area awaiting booking, Vela sprinted 20 to 30 feet and dove headfirst into a concrete wall. Vela suffered a severe head injury, was not expected to live, and was airlifted to Harborview Medical Center.

A detective called Ms. V. and told her what Vela had done. When Ms. V. heard, she became upset and started crying. A.V. ran in from a nearby room when she heard her mother crying, and she heard part of the conversation. A.V. realized that Vela was in the hospital and that he was there because of something she said.

Sometime later, two of Vela's family members spoke with A.V. on the phone saying, "'Do you know you're going to get your dad in trouble?'" 2 RP (Jan. 8, 2024) at 612. In response A.V. said, "'He did do that, and I'm not lying.'" 2 RP (Jan. 8, 2024) at 612. A.V. also saw pictures of Vela's fractured skull. A.V. repeatedly told her mother that she was not lying about what happened. However, A.V. began claiming that Ms. V.'s father coached her into making statements about Vela. Ms. V. believed her.

The State charged Vela with first degree rape of a child and first degree child molestation. For each count, the State alleged the aggravating factor that Vela used a position of trust to facilitate the commission of his crimes.

In December 2022, Ms. V. placed A.V. in counseling and expressed a concern to the counselor that A.V. had been lying. In September 2023, Ms. Murstig reinterviewed

A.V.  When Ms. Murstig spoke with her, A.V. said she had made the allegations up because "her brain was talking to her."  2 RP (Jan. 2, 2024) at 59.

*Chapter 9A.44 RCW Hearing*

Before trial, the State moved pursuant to RCW 9A.44.120 to admit into evidence the statements A.V. made to Ms. V., Ms. Ledgerwood, Officer Yates, and Ms. Murstig. Even though A.V. had recanted, the State's position was that she recanted because of the pressure she was under by family members, knowing that her father tried to kill himself.

After hearing the testimony of the child hearsay witnesses, the trial court confirmed that A.V. was competent to testify and discussed and made findings on most of the nine *Ryan*[2] factors, while noting that a couple of factors did not apply.  After making its oral findings, the court ruled that A.V.'s statements were admissible through the State's hearsay witnesses.  However, no written findings of fact or conclusions of law were entered.[3]

*ER 404(b)*

A few days later, the court held a hearing on the evidence the State wanted to admit under ER 404(b).  The State wanted to admit that A.V.'s dirty underwear had been

---

[2] *State v. Ryan*, 103 Wn.2d 165, 175-76, 691 P.2d 197 (1984).

[3] We commend the trial court on its thorough oral analysis.

found in Vela's pants pocket, and, on an earlier occasion, he had been found in possession of depictions of minors engaged in sexually explicit conduct.

The State argued that Vela's possession of A.V.'s dirty underwear in his pants pocket was relevant to show motive, specifically sexual motivation, by demonstrating Vela's interest in prepubescent children. Also, the State argued that the depictions supporting Vela's prior sex offense conviction were relevant to demonstrate intent, motive, and absence of mistake. The State argued that the absence of mistake was relevant because Vela admitted touching A.V.'s vagina but said he was trying to remove pinworms.

Defense responded that neither sexual motivation nor intent were elements of rape of a child. Nor was Vela claiming he was mistaken or that it was an accident when he tried to get the pinworms off A.V. However, defense counsel conceded that sexual gratification was an element of child molestation but expressed concern about whether a jury could consider the ER 404(b) evidence for one charge but not the other.

The court noted that an absence of mistake could go toward Vela's claim that A.V.'s underwear got into his pants pocket by mistake. The court then recognized that both pieces of evidence were highly prejudicial to the defense. But it also stated that the evidence had a high probative value and it would conduct a balancing test to determine

8

whether to admit it.  The court took a recess to gather its thoughts and to prepare notes so

as to make its oral ruling.

When the court reconvened, it spoke at length about the evidentiary rules in

general, including ER 404(b).  The court recognized that a defendant's sexual misconduct

is "[in]admissible[4] to show propensity, but may be admissible for more limited

purpose[s] such as showing a common scheme or plan, lack of accident, [or] intent."

2 RP (Jan. 8, 2024) at 564.  The court also recognized it had to perform a balancing test

with respect to the proffered evidence's probative value and its prejudicial effect.  The

court then discussed factors that could make the evidence more relevant or more

prejudicial, and burden of proof questions with respect to ER 403.  Throughout these

discussions, the court cited relevant authorities.

The court then ruled:

> [T]he Court finds that the defendant was convicted and sentenced on
> May 3rd, 2017 to two counts of possession of depictions in the first degree
> . . . adult performing oral sex on a . . . prepubescent, adolescent female with
> the allegations in this case which shows the defendant's motive and intent.
> Secondly, . . . the defendant was found to be in possession of his daughter's
> underwear . . . to show motive, specifically sexual motivation, the
> defendant's demonstrat[ed] interest in . . . preadolescent children.
> While the Court exercised balancing the probative value against the
> prejudicial effect, in the review of the rules of evidence and the case law as
> stated in my decision and the evidence presented by the parties and

---

[4] The transcriptionist typed "admissible."  But only "inadmissible" makes sense
because of the remainder of the quote.

9

argument, the Court is satisfied that the [S]tate has met their burden of proof [and] the defendant's bad acts are hereby admissible.

2 RP (Jan. 8, 2024) at 568-69.

*Trial & Sentencing*

The State called several witnesses and heard the evidence noted above. With respect to the ER 404(b) evidence, the court instructed the jury to consider Vela's possession of depictions of minors engaged in sexually explicit conduct only as evidence of motive. Deputy Scott Runge explained to the jury that he had investigated Vela in an earlier matter after a cyber tip established that images of child pornography associated with Vela's e-mail had been downloaded. He described the images in detail to the jury: one depiction showed a child about A.V.'s age exposing her privates; another showed a 10- to 12-year-old child simulating oral sex on a child about A.V.'s age; another showed an adult performing oral sex on a prepubescent child. Deputy Runge also testified he found images of bare privates of prepubescent children on Vela's phone.

At the close of the case, the court instructed the jury on the law, including instructing the jury to consider Vela's possession of A.V.'s underwear only for purposes of motive or absence of mistake or accident, and Vela's possession of depictions of minors engaged in sexually explicit conduct only for the purpose of motive. The court did not limit the "motive" evidence to the lesser charge of child molestation.

10

In closing, the State briefly mentioned A.V.'s dirty underwear found in Vela's pants pocket and argued that the underwear was evidence of Vela's motive. The State did not limit its motive argument to the child molestation count.

As to Vela's possession of depictions of minors engaged in sexually explicit conduct, the State argued:

> And the thing is, ladies and gentlemen, arguably people are looking at adult porn and might have adult porn on their phone because they have motive to have sex with adults. His motive is different.

2 RP (Jan. 12, 2024) at 832.

The jury found Vela guilty of the crimes of rape of a child in the first degree and child molestation in the first degree. The jury also found that both crimes were facilitated by Vela's position of trust.

At sentencing, the court incorporated the aggravated finding of abuse of trust and sentenced Vela to an indeterminate term of confinement of 354 months to life.

Vela promptly appealed to this court.

ANALYSIS

*ER 404(b)*

Vela argues the trial court abused its discretion by admitting evidence that his daughter's underwear was found in his pants pocket and evidence that he had earlier possessed depictions of children engaged in sexually explicit conduct.

11

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." ER 404(b). However, ER 404(b) permits evidence of prior bad acts to be admitted for other purposes, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

"We read ER 404(b) in conjunction with ER 403. ER 403 requires the trial court to exercise its discretion in excluding relevant evidence that would be unfairly prejudicial." *State v. Fisher*, 165 Wn.2d 727, 745, 202 P.3d 937 (2009). Before admitting misconduct evidence, the trial court must engage in a four-pronged analysis:

> (1) find by a preponderance of the evidence the misconduct actually occurred, (2) identify the purpose of admitting the evidence, (3) determine the relevance of the evidence to prove an element of the crime, and (4) weigh the probative value against the prejudicial effect of the evidence.

*Id.* "This analysis must be conducted on the record." *State v. Foxhoven*, 161 Wn.2d 168, 175, 163 P.3d 786 (2007). "We cannot overemphasize the importance of making such a record." *State v. Jackson*, 102 Wn.2d 689, 694, 689 P.2d 76 (1984). "[A] judge who carefully records [their] reasons for admitting evidence of prior [misconduct] is less likely to err, because the process of weighing the evidence and stating specific reasons for a decision [e]nsures a thoughtful consideration of the issue." *Id.*

We review the trial court's interpretation of ER 404(b) de novo. *Fisher*, 165 Wn.2d at 745. "If the trial court interprets ER 404(b) correctly, we review the trial court's ruling to admit or exclude evidence of misconduct for an abuse of discretion. A trial court abuses its discretion where it fails to abide by the rule's requirements." *Id.* (citation omitted).

Here, the trial court complied with the first prong of the test. It found that Vela had been convicted of possession of depictions of minors engaged in sexually explicit conduct and that Vela had been found with his daughter's underwear in his pants pocket. The trial court also complied with the second prong of the test. It identified the purpose for admitting both pieces of evidence—to show "sexual motivation, the defendant's demonstrat[ed] interest in . . . preadolescent children." 2 RP (Jan. 8, 2024) at 568-69.

However, the trial court did not comply with the third or fourth prongs of the test. With respect to the third prong, the court failed to determine the relevance of the evidence to prove an element of the crime. On appeal, the State argues that sexual interest in preadolescent children is relevant to prove an element of first degree child molestation. We agree. An element of that offense required the State to prove that Vela acted with the purpose of sexual gratification. *State v. Stevens*, 158 Wn.2d 304, 309, 143 P.3d 817 (2006) (citing RCW 9A.44.010(2)). Yet, the State fails to even argue that

13

sexual interest in preadolescent children is relevant to prove an element of first degree child rape. This is because it is not.

With respect to the fourth prong, the trial court did not weigh the probative value of the evidence against its prejudicial effect. Instead, it made a conclusory determination. During its discussion on the record, the trial court noted that in assessing the prejudicial effect, a trial court should consider the necessity of the evidence to prove an element of the crime, the availability of less inflammatory evidence to prove the element, and the potential effectiveness of a limiting instruction. *See State v. Bedada*, 13 Wn. App. 2d 185, 193-94, 463 P.3d 125 (2020). Had the trial court made more than a conclusory ER 403 determination, it could have explained why it admitted both proffers of evidence rather than just the underwear evidence—given that the underwear evidence was less inflammatory and was available to establish the sexual gratification element of child molestation. We note that the underwear evidence bears more directly on Vela's interest in his daughter. We also note that admitting the extremely repugnant depiction evidence would create an enhanced risk that the jury might react emotionally, despite a limiting instruction.

We conclude that the trial court failed to conduct a proper ER 404(b) analysis, and this failure allowed the State to improperly argue "motive" evidence to prove first degree child rape.

The State argues that evidentiary error, if any, was harmless. We disagree. Absent the ER 404(b) evidence, the State would have had some difficulty proving either charge, given A.V.'s recanting and evidence that her grandfather harbored hatred toward Vela that may have influenced A.V.'s telling of events. Further, the depiction evidence was extremely repugnant and likely caused the jury to view Vela with disgust.

CHILD HEARSAY

In criminal and dependency proceedings, RCW 9A.44.120(1) allows out-of-court statements by a child under 10 years old describing acts of sexual conduct against them to be admitted through a hearsay witness. For the child hearsay to be admitted, the trial court must first conclude "that the time, content, and circumstances of the statement provide sufficient indicia of reliability," and the child declarant must testify at trial. RCW 9A.44.120(1)(b). In determining the reliability of child hearsay, trial courts must consider the factors found in *State v. Ryan*, 103 Wn.2d 165, 175-76, 691 P.2d 197 (1984).

Vela argues the trial court misapplied the *Ryan* factors. Vela argues the trial court's failure to enter written findings of fact and conclusions of law with respect to its child hearsay ruling allows us to review that ruling de novo. Whether we agree or disagree with this argument, the failure of a trial court to enter written findings and conclusions after admitting child hearsay allows an appellant to more persuasively argue that error occurred.

15

Because a new trial is required, we do not reach this or other arguments by Vela

rendered moot by our reversal. However, we take this opportunity to emphasize to trial

courts the importance of entering written findings and conclusions after evidentiary

hearings.

Reversed and remanded for retrial.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_____
Lawrence-Berrey, C.J.

WE CONCUR:

_____          _____
Cooney, J.                                                   Murphy, J.