IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, Respondent, v. POLANCO, TYLER MICHAEL MELVIN, Appellant. | No. 87046-7-I DIVISION ONE UNPUBLISHED OPINION |

CHUNG, J. — Tyler Polanco was convicted of one count of identity theft in the first degree and eight counts of identity theft in the second degree. He challenges his convictions on several grounds, including a violation of his right to a unanimous jury verdict, improperly admitted testimony, and the sufficiency of the evidence supporting his convictions. We affirm.

BACKGROUND

Polanco's maternal grandfather, Lawrence Peterson, passed away on February 5, 2021. On February 7, Peterson's daughter Kore Storm and her two sons, Polanco and Jeffery Schmitt, went to Peterson's home to locate and secure any important documents. Storm found Peterson's wallet and later discovered it contained an expired debit card for an account he held with Heritage Bank.

In the days following the visit to Peterson's home, Heritage Bank advised Storm that transactions were occurring on the account after her father's death. Once Storm discovered the transactions, she contacted law enforcement. Heather Joyce, a detective

with the Snohomish County Sheriff's Office, was assigned to investigate the suspected fraudulent transactions. Heritage Bank provided Joyce with surveillance footage of some of the automated teller machine (ATM) transactions. Joyce then sent images from the surveillance videos to Storm, who identified Polanco as the individual seen conducting the transactions. The withdrawals—primarily cash withdrawals from ATMs—took place from February 8 to 18 and totaled $7,247.60. Neither Storm nor Joyce spoke to Polanco about these transactions.

The State charged Polanco with one count of identity theft in the first degree and eight counts of identity theft in the second degree. At trial, Polanco stipulated to the admission of surveillance footage acquired from Walmart and to the fact that he was the person in the video utilizing the debit card. Thus, Polanco did not contest that he had used Peterson's debit card, only whether he had authorization to do so.

The State introduced testimony from Storm concerning Polanco's relationship with Peterson and his possible access to Peterson's debit card. Storm confirmed that Polanco had lived with Peterson during his senior year of high school and moved out after about a year and a half. Storm believed Polanco had moved out because Peterson was "not being very nice to him" and due to something related to Polanco's job at the time. Storm also confirmed that prior to moving out, Polanco and Peterson were close but that Polanco did not discuss with her whether the two had reconciled before Peterson's death. Additionally, Storm recalled Peterson being upset that Polanco moved out.

When asked to recall if Peterson had ever given Polanco access to a debit card when he was living with him, Storm responded, "[n]o." On cross-examination, when

2

asked if she believed Peterson would have given Polanco a personal identification number (PIN) for Peterson's debit card, Storm stated, "Probably," and that "most likely [her] father gave his pin number to [Polanco] when [Polanco] was living with him." On re-direct, Storm further testified that she "believe[d] that [her] father most likely gave the pin number to [Polanco] to help with buying groceries when [Polanco] lived there." When asked what was the basis for her belief, Storm responded, "because my dad told me." Defense counsel objected to the statement as hearsay, but the court overruled the objection.

Storm also testified to two occasions where she observed Polanco and Peterson interact after Polanco moved out. She discussed a holiday party in 2016 where "the room became very cold" when Polanco arrived at the party. Storm also spoke about a high school graduation, around 2018 or 2019, at which she believed the two continued to not get along. Lastly, the State admitted a Facebook Messenger conversation between Polanco and Schmitt which took place after the State had filed the charges in this case. In the message, Schmitt asked Polanco how the case was going, and Polanco stated, "I'm sorry that you even have to worry about any of this this shouldn't have gone down like this if anything mom should have talked to me and I would have worked something out and paid her or whatever I just can't believe this crap."

The jury found Polanco guilty of all nine counts. Polanco timely appeals.

DISCUSSION

Polanco contends that his right to jury unanimity was violated because the State presented multiple acts that could satisfy each count but failed to elect which act supported each count, and the court did not provide a jury instruction requiring

unanimity. He also argues that the trial court erred when it permitted Storm to testify that she believed Polanco had limited access to Peterson's debit card to buy groceries because her belief was based on hearsay. He also challenges Storm's testimony concerning the interactions she observed between Polanco and Peterson as irrelevant and unduly prejudicial. Finally, he challenges the sufficiency of the evidence supporting his convictions. We address each issue in turn.

I. Jury Unanimity

Criminal defendants have a right to a unanimous jury verdict. WASH. CONST. art. I, § 21; State v. Ortega-Martinez, 124 Wn.2d 702, 707, 881 P.2d 231 (1994). When the State presents evidence of multiple acts that could constitute the crime charged, the jury must unanimously agree on which act constituted the crime. State v. Kitchen, 110 Wn.2d 403, 411, 756 P.2d 105 (1988). To ensure unanimity, the State must either elect the act it is relying on or the trial court must provide a unanimity instruction, often referred to as a "Petrich instruction." See State v. Petrich, 101 Wn.2d 566, 683 P.2d 173 (1984), overruled on other grounds by Kitchen, 110 Wn.2d at 405-06; see 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTION: CRIMINAL 4.25 (5th ed. 2024). Otherwise, some of the jurors may rely on one act to convict while others may rely on another. Kitchen, 110 Wn.2d at 411.

"Whether a unanimity instruction was required is reviewed de novo." State v. Aguilar, 27 Wn. App. 2d 905, 924, 534 P.3d 360 (2023) (citing State v. Boyd, 137 Wn. App. 910, 922, 155 P.3d 188 (2007)). A violation "may be raised for the first time on appeal under the manifest constitutional error standard." Aguilar, 27 Wn. App. 2d at 918; RAP 2.5(a). A constitutional error occurs in a multiple acts case in which no

election was made and no Petrich instruction was given, "but reversal is not warranted if the error was harmless." Aguilar, 27 Wn. App. 2d at 924.

The jury instruction for count one, identity theft in the first degree, stated that the alleged acts occurred during a range of dates, February 16 through February 18. The jury instructions for counts two through nine charged identity theft in the second degree and were identical to one another except for the date of offense. For the instructions of counts two through nine that shared a date of offense, the "to convict" portion of the instruction included language that said "in an act separate and distinct from" the other act alleged to have occurred on the same date. However, the State presented evidence of multiple acts on each date, as follows:

- The State alleged acts to prove that count one occurred between February 16-18 and count nine occurred on February 16. The State presented evidence of six transactions posted on February 16.

- The State alleged acts to prove that counts two and three occurred on February 8. However, the State provided evidence of four different transactions on this date.

- The State alleged acts to prove counts four and five occurred on February 9 and presented evidence of three different transactions on this date.

- The State alleged acts to prove that counts six, seven, and eight occurred on February 11, 12, and 13, respectively. Although the counts did not overlap with their dates, the State presented evidence of three

transactions on February 11, three transactions on February 12, and five transactions on February 13.

Neither the State nor Polanco sought a Petrich instruction, and the State did not elect a specific act to support each charge.

Because Polanco accepted the jury instructions without objection, the State contended that Polanco's jury unanimity argument is waived because the error is "not 'manifest' under RAP 2.5(a)(3)." Ordinarily, the "appellate court may refuse to review any claim of error which was not raised in the trial court," unless the claimed error is a "manifest error affecting a constitutional right." RAP 2.5(a). "To meet RAP 2.5(a) and raise an error for the first time on appeal, an appellant must demonstrate (1) the error is manifest, and (2) the error is truly of constitutional dimension." State v. O'Hara, 167 Wn.2d 91, 98, 217 P.3d 756 (2009). "If a court determines the claim raises a manifest constitutional error, it may still be subject to a harmless error analysis." Id.

Courts have consistently recognized that jury unanimity issues are "of constitutional magnitude." State v. Moultrie, 143 Wn. App. 387, 392, 177 P.3d 776 (2008); Aguilar, 27 Wn. App. 2d at 924 ("A constitutional error occurs in a multiple acts case in which no Petrich instruction was given and no election was made.") (citing Kitchen, 110 Wn.2d at 409-11). Accordingly, Polanco has demonstrated the error is "truly of constitutional dimension." See O'Hara, 167 Wn.2d at 98.

"After determining the error is of constitutional magnitude, the appellate court must determine whether the error was manifest." Id. at 99. " 'Manifest' in RAP 2.5(a)(3) requires a showing of actual prejudice." State v. Kirkman, 159 Wn.2d 918, 935, 155 P.3d 125 (2007) (citing State v. Walsh, 143 Wn.2d 1, 8, 17 P.3d 591 (2001)). To show

actual prejudice, a defendant needs to make a " 'plausible showing . . . that the asserted error had practical and identifiable consequences in the trial of the case.' " Kirkman, 159 Wn.2d at 935 (quoting State v. WWJ Corp., 138 Wn.2d 595, 603, 980 P.2d 1257 (1999)).

"In order to ensure the actual prejudice and harmless error analyses are separate, the focus of the actual prejudice must be on whether the error is so obvious on the record that the error warrants appellate review." O'Hara, 167 Wn.2d at 99-100. Indeed, "It is not the role of an appellate court on direct appeal to address claims where the trial court could not have foreseen the potential error or where the prosecutor or trial counsel could have been justified in their actions or failure to object." Id. at 100. "Thus, to determine whether an error is practical and identifiable, the appellate court must place itself in the shoes of the trial court to ascertain whether, given what the trial court knew at that time, the court could have corrected the error." Id.

Here, based on the charging document and evidence presented at trial, the unanimity error raised by Polanco is manifest. Indeed, the State presented evidence of multiple acts that could have supported each charge. The State argues that the error "would not have been obvious to the trial court because the defendant sought and received specific language in the 'to convict' instructions requiring that the jury rely on separate and distinct acts for each charge with more than one transaction on a specific date." However, given that the State presented evidence of multiple acts that could have supported each count, the error is "so obvious on the record that [it] warrants appellate review."[1] See O'Hara, 167 Wn.2d at 99-100.

---

[1] The State cites to cases where a court has declined to consider unanimity errors raised for the first time on appeal under RAP 2.5(a)(3). However, several of the cited cases are unpublished and are

"A conviction beset by this error will not be upheld unless the error is harmless beyond a reasonable doubt." State v. Coleman, 159 Wn.2d 509, 512, 150 P.3d 1126 (2007). "The presumption of the error is overcome only if no rational juror could have a reasonable doubt as to any of the incidents alleged." Id. (citing Kitchen, 110 Wn.2d at 411-12).

"Courts that have affirmed multiple acts cases despite finding error tend to do so because there is no material difference in the evidence supporting one act and the evidence supporting another." Aguilar, 27 Wn. App. 2d at 928. For example, in State v. Camarillo, 115 Wn.2d 60, 794 P.2d 850 (1990), the victim testified to three distinct instances of indecent liberties, each separately capable of supporting the charge. Id. at 66-67. The defendant responded with a general denial and " 'offered no evidence upon which the jury could discriminate between the incidents.' " Id. at 68, 70 (quoting State v. Camarillo, 54 Wn. App. 821, 828, 776 P.2d 176 (1989)). The court reasoned that "the jury may consider the totality of the evidence of several incidents to ascertain whether there is proof beyond a reasonable doubt to substantiate guilt because of the acts constituting one incident and also to believe that if one happened, then all must have happened." Camarillo, 115 Wn.2d at 71. "The jury was free to believe the victim, disbelieve the defendant and give no weight whatsoever to the seemingly irrelevant testimony of the woman" who testified she had never seen the defendant and the victim alone. Id. And because "[t]here was no uncertainty on the part of the boy regarding the

_____

not precedential under GR 14.1(a). And others are distinguishable, as the courts determined the error was not manifest because the acts constituted a continuing course of conduct. State v. McNearney, 193 Wn. App. 136, 373 P.3d 265 (2016); State v. Rodriguez, 187 Wn. App. 922, 936, 352 P.3d 200 (2015) (neither election nor a unanimity instruction is necessary if the defendant engaged in multiple acts that form a single continuing course of criminal conduct).

type of sexual contact; there was no conflicting testimony about what had occurred on the three occasions testified to by the boy; the boy's testimony was unimpeached; and there was no attendant confusion as to dates and places on the part of the victim," the court held the error was harmless. Id. at 72. Similarly, in State v. Bobenhouse, the victim testified about two separate instances of rape, and the defendant responded with a general denial, and the appellate court concluded that the trial court's failure to instruct the jury on unanimity constituted harmless error. 166 Wn.2d 881, 894-95, 214 P.3d 907 (2009).

Here, as in Camarillo, 115 Wn.2d 60, and Bobenhouse, the jury was presented with uncontroverted evidence that the defendant performed each of the charged acts.[2] At trial, Polanco conceded that "not once have we contended that [Polanco] didn't do that, that he didn't go to an ATM to withdraw funds. That is a fact." Instead, his defense to all of the charged acts was that he "did in fact have permission to use [the debit] card, that he was given a card, that he was given the PIN number to use that card."[3] Accordingly, the jury was free to believe the evidence presented by the State that documented various transactions after Peterson's death and to disbelieve Polanco's defense that he had permission to use the debit card. Because his defense did not differ as to any particular charged act, and each act was sufficient to establish that each crime had occurred, if the jury "reasonably believe[] that one incident happened, it must have believed each of the incidents happened." Bobenhouse, 166 Wn.2d at 895. As such, the

[2] Many transactions were ATM cash withdrawals from Heritage Bank. Other transactions were charges at Wal-Mart, locations referred to as "Tobacco City" and "Zakks Smoke," Best Buy, Burger King, "Ichibang Teriyaki," Amazon Digital and Prime Video, and Chevron.
[3] Even though Storm testified that his access was limited to groceries, Polanco never suggested such limitations. Therefore, Polanco did not attempt to distinguish certain transactions as permitted because they were for groceries.

trial court's failure to instruct the jury on unanimity and the State's failure to elect which act supported each charge was harmless error.

II. Evidentiary Errors

Polanco argues that the court "committed a series of evidentiary errors that require reversal." First, he contends the trial court erred when it admitted a hearsay statement. Further, he challenges the court's admission of Storm's testimony about her observations of Polanco and Peterson from years prior.

Ordinarily, we review "a trial court's decisions as to the admissibility of evidence under an abuse of discretion standard." State v. Pirtle, 127 Wn.2d 628, 648, 904 P.2d 245 (1995). "[A]n erroneous evidentiary ruling does not result in reversal unless the defendant was prejudiced." State v. Gonzalez-Gonzalez, 193 Wn. App. 683, 689, 370 P.3d 989 (2016). "For evidentiary errors not implicating a constitutional mandate, we reverse only if, 'within reasonable probabilities, the outcome of the trial would have been materially affected had the error not occurred.' " Id. (quoting State v. Tharp, 96 Wn.2d 591, 599, 637 P.2d 961 (1981)).

A. Admission of Hearsay Statement

First, Polanco argues the court erred "when it admitted a hearsay statement from the alleged victim regarding [his] authorization to use the debit card, the central issue at trial." The State counters that "[u]nder the rule of completeness, [it] was entitled to explain, modify, or rebut the evidence elicited by [Polanco] regarding" a hearsay statement by Storm.

During a portion of Storm's cross-examination, Polanco asked if "at any point, did [she] tell anyone that [she] believed that . . . [her] father may have given [Polanco] a

10

pin"? She responded that "most likely [her] father gave his pin number to [Polanco] when [Polanco] was living with him." Storm continued to respond, but defense counsel objected on the grounds that her additional testimony was non-responsive. The State argued that she was completing her statement from a prior interview, and defense counsel responded that the "State could ask that in cross or redirect." The court sustained the objection.

On re-direct examination, the State revisited the topic, seeking to introduce a portion of Storm's pre-trial interview that concerned access to Peterson's debit card. The following exchange took place:

Q[uestion (Q.)] [State:] Do you recall what you were trying to say at that time?

. . . .

A[nswer (A.)] [Storm:] I - - I believe that my father most likely gave the pin number to [Polanco] to help with buying groceries when [Polanco] lived there.

[Defense:] Objection. Calls for speculation. Move to strike.

The Court: Overruled.

Q. [State:] What was the basis of that belief?

A. [Storm:] Because my dad told me.

[Defense:] Objection. Hearsay.

The Court: Overruled.

. . . .

Q. [State:] Was your father's statement - - statement or statements to you the basis of each of those beliefs?

A. [Storm:] Yes.

11

We first address Polanco's contention that Storm's testimony contained hearsay. We review whether a statement was hearsay de novo. State v. Hudlow, 182 Wn. App. 266, 281, 331 P.3d 90 (2014). Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. ER 801(c). A "statement" is an oral or written assertion, or a person's nonverbal conduct, if it is intended by the person as an assertion. ER 801(a). "Whether a statement is hearsay depends upon the purpose for which the statement is offered." State v. Crowder, 103 Wn. App. 20, 26, 11 P.3d 828 (2000). If an out-of-court statement "is offered for the truth of what someone told the witness, the statement is hearsay even though the witness only implies the out-of-court statement." Gonzalez-Gonzalez, 193 Wn. App. at 690.

Storm testified that that the basis for her belief "that my father most likely gave the pin number to [Polanco] to help with buying groceries when [Polanco] lived there" was that her father told this to her. As her statement about the PIN was an out-of-court statement offered for the truth of what her father told her, the testimony qualifies as hearsay. However, the State argues that the rule of completeness permitted the State to elicit these further statements by Storm.

Codified as ER 106, the rule of completeness specifies that "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the party at that time to introduce any other part, or any other writing or recorded statement, which ought in fairness to be considered contemporaneously with it." See State v. Bennett, __ Wn.3d __, 582 P.3d 294, 297 (2026). In State v. West, our Supreme Court explained when the rule of completeness could apply:

> Where one party has introduced part of a conversation the opposing party is entitled to introduce the balance thereof in order to explain, modify or

rebut the evidence already introduced insofar as it relates to the same subject matter and is relevant to the issue involved. This is true though the evidence might have been inadmissible in the first place.

70 Wn.2d 751, 754-55, 424 P.2d 1014 (1967).

Our Supreme Court in Bennett recognized that in following that line of reasoning, the "common law rule of completeness applies over a hearsay objection." Id. at 302; see also State v. Lowenthal, 183 Wash. 14, 18, 48 P.2d 909 (1935) (holding hearsay statements were permitted because " '[w]hen part of a conversation is given in evidence by one party, the whole on the same subject may be inquired into by the other.' " (quoting Clark A. Nichols, APPLIED EVIDENCE, 1365 (Chicago, Callaghan and Co., eds., 1928))); State v. Haywood, 2 Wn. App. 109, 110, 466 P.2d 859 (1970) ("The court ruled testimony by a police officer about a conversation between the officer and a doctor who examined the victim was admissible. This ruling was proper inasmuch as defendant's counsel had previously introduced part of the same conversation as evidence."); State v. Stamm, 16 Wn. App. 603, 609, 559 P.2d 1 (1976) ("The defense commenced the inquiry into the nature of the telephone conversation between Fisher and his mother during cross-examination, and now is precluded from challenging the prosecution's attempt to bring out more of the same conversation on redirect."). However, it noted that application of the rule generally remains "fairly narrow." Bennett, 582 P.3d at 303.

Here, the State sought to introduce a portion of Storm's pre-trial interview. During cross-examination of Storm, Polanco elicited testimony that during a pre-trial interview, she acknowledged that Peterson "probably" shared his PIN with Polanco when the two were living together. The court sustained Polanco's objection to her testifying further at that point. Later, on re-direct examination by the State, it revisited the topic about the

PIN, and Storm then added the hearsay statement that her father gave Polanco the PIN to help with buying groceries when they lived together—in other words, that there were limitations placed on the use of the card.

Polanco argues that the rule of completeness cannot apply because initially, when he cross-examined Storm, he elicited information from a separate portion of Storm's pre-trial interview that concerned access to Peterson's debit card. However, the argument is unpersuasive, as neither ER 106 nor cases addressing the common law rule of completeness restrict the rule in such a way. Rather, as explained in West, 70 Wn.2d at 754-55, interpretation of the rule focuses on whether the statement was part of the same conversation, whether the introduced portion relates to the same subject matter, and whether the evidence is relevant to the issue involved. All three requirements are met here. First, both portions of Storm's testimony were about the same conversation, i.e., the pre-trial interview—even though the statements occurred at different points of the interview. Second, the subject matter of both portions of the statements were Polanco's access to the debit card and what limitations were placed on that access. Finally, Polanco's access to the card and any limitations on his access were relevant to whether Polanco intentionally used Peterson's financial information to commit a crime. Accordingly, the trial court did not err when it permitted the State to introduce the remaining portion of Storm's statements.

B.  Storm's Testimony about Interactions between Polanco and Petersen

Second, Polanco argues the court erred "when it allowed [] Storm to testify to her observations of [] Polanco and his grandfather at events that occurred years prior to the alleged offenses." We disagree.

14

Polanco moved orally pursuant to ER 403 to exclude Storm's observations of seemingly negative interactions between himself and Peterson at a family gathering in 2016 and at a graduation around 2018 or 2019. The trial court and the parties discussed Storm's expected testimony regarding the two instances she observed between Polanco and Peterson after Polanco had moved out. At first, the court focused on when the debit card was issued. The State commented that it did not know. In response, the court stated,

> I need to know that to know the relevance of the statements, right? So if that was a falling out between the parties in 2015 and then there was a card that was issued in 2017 that [] Polanco has . . . I'm not sure that whatever happened in 2015 is relevant.

The State and Polanco appeared to agree that Storm would testify that "Polanco had a [debit] card that he had been given authority to use when he was living with [] Peterson." After some back and forth, Polanco clarified that

> absent [] Peterson and/or [] Polanco taking the stand, we do not have any information regarding when the relationship may have been repaired.
>
> [] Storm did not talk about [] Polanco very much with her father. It is unclear how often they discussed [] Polanco. She cannot testify as to whether or not there was ever a reconciliation. And so to say that it's a extended consent - - all we're arguing is that there was consent. We're not arguing when it started, when it ended, whether it restarted. We're saying there is consent.

The court then ruled as follows:

> If there is not clarity and the argument is in fact that there was consent at some time - - and certainly that is what [] Storm is going to say is that in 2015, there was consent - - I do think the issues of any observations of breakdown in communications, although not dispositive, are certainly relevant to the issue of whether or not there was a relationship such that there should have been a belief that use of the [debit] card was permitted.

15

In general, "[a]ll relevant evidence is admissible." ER 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. Because Polanco's theory of the case was that Peterson granted him permission to withdraw funds starting from when the two lived together, the trial court did not abuse its discretion when it concluded that Storm's testimony about the two incidents she observed in the years after Polanco moved out was relevant, as it related to whether Polanco had permission to use the debit card after Peterson had passed away. Notably, no evidence was introduced that Peterson and Polanco reconciled.

Even if evidence is relevant, it may be "excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." ER 403. When balancing the probative value of evidence against its prejudicial effect, the court should consider

> "the importance of the fact of consequence for which the evidence is offered in the context of litigation, the strength and length of the chain of inferences necessary to establish the fact of consequence, the availability of alternative means of proof, whether the fact of consequence for which the evidence is offered is being disputed."

State v. Bedada, 13 Wn. App. 2d 185, 193-94, 463 P.3d 125 (2020) (internal quotation marks omitted) (quoting State v. Kendrick, 47 Wn. App. 620, 628, 736 P.2d 1079 (1987)).

On appeal, Polanco contends that "[b]y presenting this evidence, the State essentially asked the jury to infer that, because [] Polanco and his grandfather were not on good terms in 2016 and 2018, they must not have been on good terms in 2021,

when the alleged charges occurred," so the evidence should have been excluded as "highly speculative," "misleading," and "unfairly prejudicial. But other than this conclusory statement, Polanco neither provides authority regarding ER 403, nor does he meaningfully engage in an ER 403 analysis.

Because Storm's testimony was the only evidence about the status of Polanco and Peterson's relationship, it was important to a fact of consequence—whether Polanco had ongoing consent to use the debit card. Because Polanco fails to demonstrate how the relevance was substantially outweighed by the danger of unfair prejudice, we hold that the trial court did not abuse its discretion when it allowed Storm's testimony about the two events at which Polanco and Peterson were apparently cold to one another.

III. Sufficiency of the Evidence

Finally, Polanco argues that "[s]ufficient evidence does not support [his] convictions for identity theft in the first and second degree because the evidence showed [he] had permission to use his grandfather's debit card." We disagree.

Due process requires the State to prove every element of a crime beyond a reasonable doubt. State v. Johnson, 188 Wn.2d 742, 750, 399 P.3d 507 (2017). To determine whether sufficient evidence supports a conviction, an appellate court must consider "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." State v. Zghair, 4 Wn.3d 610, 619-20, 567 P.3d 1 (2025) (quoting Jackson v. Virginia, 443 U.S. 307, 318-19 (1979)). A claim of insufficient evidence admits the truth of the State's evidence and all reasonable inferences from

that evidence. State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). All reasonable inferences must be interpreted in favor of the State and most strongly against the defendant. Id. Whether sufficient evidence supports a defendant's conviction is a question of law reviewed de novo. State v. Rich, 184 Wn.2d 897, 903, 365 P.3d 746 (2016).

Circumstantial and direct evidence are equally reliable. State v. Lazcano, 188 Wn. App. 338, 363, 354 P.3d 233 (2015). Additionally, " 'specific criminal intent of the accused may be inferred from the conduct where it is plainly indicated as a matter of logical probability.' " State v. Johnson, 159 Wn. App. 766, 774, 247 P.3d 11 (2011) (quoting State v. Delmarter, 94 Wn.2d 634, 638, 618 P.2d 99 (1980)). The jury is the "sole and exclusive judge of the evidence, the weight given thereto, and the credibility of witnesses." State v. Bencivenga, 137 Wn.2d 703, 709, 974 P.2d 832 (1999).

For the charges of identity theft, the State was required to prove—among other things—that Polanco utilized Peterson's debit card "with the intent to commit, or to aid or abet, any crime." RCW 9.35.020(1). The State alleged that Polanco intended to commit theft in the third degree when he used Peterson's debit card.[4]

At trial, the parties presented conflicting evidence as to whether Polanco utilized Peterson's debit card with the intent to commit third degree theft. However, when viewing the evidence in the light most favorable to the State, any rational trier of fact could have found that Polanco intended to commit third degree theft when using Peterson's debit card. Storm testified that Peterson and Polanco were at one point close and lived together. She also shared that during that time, it was likely that Polanco was

---

[4] "A person is guilty of theft in the third degree if he or she commits theft of property or services which (a) does not exceed seven hundred fifty dollars in value." RCW 9A.56.050.

given access to Peterson's debit card, perhaps with the limitation that it was to be used for groceries. Furthermore, Storm testified to two family events after Polanco moved out of his grandfather's home, which indicated the two had not reconciled. Storm also acknowledged she was unaware of any reconciliation and was the only witness to provide testimony about the relationship. The State also submitted a text message into evidence where Polanco stated Storm "should have talked to [him] and [he] would have work something out and paid her or whatever." Finally, the total amount removed from the account—$7,247.60—was high given the evidence introduced that indicated Polanco was permitted to use the card on a limited basis. Accordingly, sufficient evidence supported his convictions.

## CONCLUSION

We affirm.

_____
Chung, J.

WE CONCUR:

_____          _____
Coburn, J.